Richard Wayne SNELL *v.* STATE of Arkansas

CR 85-206                                    721 S.W.2d 628

Supreme Court of Arkansas
Opinion delivered. December 15, 1986
[Supplemental Opinion on Denial of Rehearing
February 9, 1987.*]

*Glaze, J., not participating.

504

*Attaway & Shumaker*, by: *Rick C. Shumaker*; and *Dowd, Harrelson & Moore*, by: *Marshall Moore*, for appellant.

*Steve Clark*, Att'y Gen., by: *Jack Gillean*, Asst. Att'y Gen., for appellee.

STEELE HAYS, Justice. On November 1, 1984 Richard

Wayne Snell was charged by information with the violation of Ark. Stat. Ann. § 41-1501 by murdering William Stumpp in the course of a robbery. Stumpp's body was found in his Texarkana, Arkansas, pawnshop on November 3, 1983. He had been shot three times in the back of the head with a .22 calibre pistol. Weapons, cash and jewelry were missing. Snell was convicted and sentenced to death by lethal injection. Numerous points of error are presented on appeal. Our jurisdiction attaches under Rule 29(1)(e). We affirm the conviction and the sentence imposed.

### Information Given Jury During Deliberation

Appellant's first point for reversal asserts the trial judge erred in informing the jury about the meaning of life without parole. While the jury was deliberating the penalty, it asked the court whether a sentence of life without parole *"really* means *no parole."* By agreement of counsel for the defense and for the state the court answered by explaining that under a sentence of life without parole the defendant would be incarcerated for life in the Department of Correction unless the governor commuted the sentence to a term of years. The jury later returned a verdict of death.

Citing *Bush* v. *State*, 261 Ark. 577, 550 S.W.2d 175 (1977) and *Andrews* v. *State*, 251 Ark. 279, 472 S.W.2d 86 (1971), appellant argues it was error to give this information to the jury notwithstanding his approval. But in neither of those cases did the defendant expressly approve of the jury being given the information about parole. In *Andrews* the defendant expressly objected. In *Bush*, there was no opportunity to object, as the information was given to the jury privately by the trial judge.

There is nothing so corrupting in the jury being told about parole that defense counsel can stipulate to a statement of the law being given to a jury and then use it as a means of reversal. For a good many years, the giving of such information to the jury, provided it was not inaccurate, was approved by our cases. See *Glover* v. *State*, 211 Ark. 1002, 204 S.W.2d 373 (1947); *Pendleton* v. *State*, 211 Ark. 1054, 204 S.W.2d 559 (1947) and see *California* v. *Ramos*, 463 U.S. 992 (1983). This exact situation occurred in *Smith* v. *State*, 278 Ark. 463, 648 S.W.2d 792 (1983) and we rejected the claim of error, saying that counsel

may not agree to action taken by the trial court and then argue on appeal that such action is error.

## Change of Venue

Appellant next contends the trial court abused its discretion in denying a motion for a change of venue. The trial court found the supporting testimony insufficient and we are not persuaded the trial court's wide discretion was abused. The motion, filed by Wayne Snell acting as co-counsel, came only two weeks before trial, after the case had been pending for nine months. Two affidavits accompanied the motion and the affiants were questioned at a hearing a week before trial. While doubtless sincere in their own opinion, the affiants could cite little or nothing beyond their own convictions that a fair trial was not possible in the case and the trial court found the testimony insufficient. One affiant could recall neither a specific conversation nor an individual with whom she had discussed the case. She did not know if she had talked to anyone from the communities of Valley Gin, Kiblah, Dodridge, Bright Star, Sulpher, Genoa, Fouke, Mandeville, Pleasant Hill, Homan or Rondo.

> Q: So your testimony is that you can not tell the Court that you have talked to anyone from those areas or know the public opinion of persons in those areas?

> A: Not in those areas.

While the other affiant was somewhat more specific, we cannot say the trial court's characterization of the sum of their testimony as "too remote" constitutes an abuse of his discretion in these matters. Our statute, Ark. Stat. Ann. § 43-1502 (Repl. 1977), requires the defendant to produce at least two "credible persons" in support. But when those persons have knowledge concerning only a lesser portion of the county from which the jurors will be chosen, we have held that the trial court is justified in finding their testimony as lacking in credibility within the meaning of the statute. *Jordan* v. *State*, 141 Ark. 504, 217 S.W. 788 (1920); *Brown* v. *State*, 134 Ark. 597, 203 S.W. 1031 (1918); and *Dewein* v. *State*, 120 Ark. 302, 179 S.W. 346 (1915).

■■ Appellant urges that in *Rush* v. *State*, 238 Ark. 149, 379 S.W.2d 29 (1964), where the defendant offered twelve affidavits and the state none, we held the trial court abused its discretion in denying a change of venue. We do not read the opinion in the *Rush* case as holding that however weak the supporting affidavits, the court must grant a change if the state fails to present offsetting proof, the defendant must still present two *credible* witnesses as defined by our statute and case law. In *Rush*, the defendant's twelve affidavits met the requirements of the statute and the state failed to meet them with proof to the contrary. On that set of facts, the trial court was reversed. We refuse to adopt a rule that tends to gauge a change of venue by purely mechanical formulas. We have held these issues are largely subject to the trial court's discretion. In *Kirkendall* v. *State*, 265 Ark. 853, 581 S.W.2d 341 (1979), we said:

> A change of venue should be granted only when it is clearly shown that a fair trial is likely not to be had in the county. For these reasons such matters are left to the sound discretion of the trial court who is in a much better position to evaluate the situation than we are.

Appellant maintains he was deprived of the opportunity to question several jury panelists who were excused by the trial judge prior to the individual voir dire. Seven panel members were in fact excused on the basis of questions posed to the entire panel by the trial judge concerning familiarity with the attorneys, the defendant, or the victim. All seven were excused because they were acquainted with the victim. Not until the fifth panelist was questioned did the defense request the opportunity to ask about pretrial publicity. The request was denied by the trial court with the remark that counsel had previously agreed on that procedure — the trial judge would ask the usual general questions of the entire panel and counsel would then voir dire each panel member individually, with the defendant being permitted to ask about pretrial publicity. Counsel for appellant acknowledged that understanding. Moreover, the excusing of three panel members because of friendship with the victim could not have prejudiced the defendant, the question is, did the selection process result in a fair jury and nothing to the contrary is demonstrated. As to the dissent's assertion that Richard Wayne Snell was tried twice for

the murder of Officer Lewis Bryant, we have searched the record and find no mention of that occurrence throughout the trial. It was mentioned by a few panelists during voir dire, but of those only one was seated on the jury and he was pronounced "good" by both the state and the defense. It should be noted the defense had peremptory challenges remaining when the twelfth juror was accepted. See *Fairchild* v. *State*, 284 Ark. 289, 681 S.W.2d 280 (1984).

## *William Stumpp's Business Records*

Over appellant's hearsay objection William Stumpp's log of firearm transactions was introduced under the business records exception to the hearsay rule. A.R.E. Rule 803. The records reflected that a .45 calibre Colt Combat Commander automatic pistol was acquired by William Stumpp on November 1, 1982 in a pawn by Vicki Holmer, wife of John Thomas Holmer. Other proof established that the pistol belonged to John Thomas Holmer and was taken by Snell in the robbery and was used by Snell in the gun fight with the police at Broken Bow.

Citing A.R.E. Rule 803 and *Cates* v. *State*, 267 Ark. 726, 589 S.W.2d 598 (1979), appellant contends the requirement that the entries be made at or near the time the act occurred was not met. Mr. Cerrato, administrator of Stumpp's estate, testified the entries were all in Stumpp's handwriting and were entered in numerical and chronological order. He said as a general rule Mr. Stumpp wrote entries in his records before the end of each day, but he could not say categorically every entry was made in that fashion and thus the appellant argues there is no proof the record was made at or near the time the act occurred.

We think there was a sufficient basis for the introduction of these records. They are regular on their face; there is no showing the entries are not in the order in which they occurred, and all are in proper sequence. Stumpp was required to record these transactions by regulations of the Alcohol, Tobacco and Firearm Agency of the federal government, and only he could say with certainty that the entries were made contemporaneously with the event. The testimony that Stumpp customarily made entries on the day they occurred, the absence of any alteration appearing in the records, and the requirement of the federal

agency making the timely entry of such transactions mandatory, satisfy us that the elements of Rule 803 were substantially met. For that matter this proof was entirely cumulative of other evidence showing the pistol was taken in the robbery.

### Search of the Van

Appellant argues that evidence was unlawfully seized from his van. On the afternoon of June 30, 1984 police officers in Oklahoma received a report that a suspect in a shooting at DeQueen, Arkansas, might be approaching Broken Bow in a van, pulling a trailer. When officers intercepted the van Snell jumped out firing a submachine gun and the .45 calibre pistol taken in the robbery of William Stumpp. Snell was wounded and promptly removed to a hospital.

The officers observed unusual electrical devices in the van and called for demolition experts. At about 6:30 Officer Gregory Glenn of the Oklahoma State Bureau of Investigation began an inventory search of the van. He opened a box on the passenger side, removed some newspapers, and found a .22 Ruger pistol with a silencer which proved to be the weapon used to kill William Stumpp. Additional weapons and explosives were found in the van.

At a suppression hearing Snell argued the Ruger pistol should not have been admitted as evidence because his van was searched and the evidence seized without a warrant in violation of the Fourth Amendment to the Constitution. The trial judge found the search was performed in connection with a need to inventory the contents of Snell's van and trailer and was a lawful exercise of police authority. We find no error in his ruling.

Snell maintains when he was disarmed and removed to the hospital exigent circumstances vanished and a search warrant could then have been obtained. But the Fourth Amendment proscribes only *unreasonable* searches and seizures, the relevant test being not the opportunity to procure a search warrant, but the reasonableness of the seizure in light of all the attendant circumstances. *United States* v. *Gravitt*, 484 F.2d 375 (1973); *Coolidge* v. *New Hampshire*, 403 U.S. 443 at 509-10 (1971); *Cooper* v. *California*, 386 U.S. 58 at 61 (1967).

■ Even if it could be said there was no probable cause to believe the van contained illegal weapons and explosives constituting a risk to police and public, a doubtful premise in view of the events at DeQueen and Broken Bow, (see *Chambers* v. *Monroney*, 339 U.S. 42 (1970)), the warrantless search of a vehicle for purposes of protecting the contents has been widely recognized as a sufficient basis for seizure. *Florida* v. *Meyers*, 466 U.S. 380, 104 S.Ct. 1852 (1984) (Per Curiam); *Michigan* v. *Thomas*, 458 U.S. 259 (1982); *South Dakota* v. *Opperman*, 428 U.S. 364 (1976); *Bennett* v. *State*, 507 P.2d 1252 (Okla. Ct. App. 1973).

■ Here, there was testimony by state and local officers that an inventory search was standard procedure in all cases of an impounded vehicle. Officer Glenn testified that he was so engaged when he opened the unlocked container and removed the pistol. Thus, the trial court's reliance on an inventory search as a valid basis for the seizure of the pistol was fully sustained by the proof.

### Cerrato Statement

Appellant argues that two items of exculpatory information were withheld from the defense, notwithstanding his motion for discovery pursuant to A.R.Cr.P. Rule 17.1. The first involved Joe Cerrato. Before cross-examination began, defense counsel asked whether the witness had given a statement. He said he had been orally interviewed. Evidently with difficulty, a taped interview by police was located and furnished to appellant. The next day the defense moved for a mistrial on the allegation that "possible exculpatory information" had been withheld in that Cerrato reported that William Stumpp had been threatened over a pawn by a black man some two weeks before his death. The state counters that it had no knowledge of the information, that it was "rank hearsay" and does not tend to "negate the guilt of the defendant" as provided in A.R.Cr.P. Rule 17.

■ We reject appellant's argument for two reasons: first, we are told nothing of the threat itself, what prompted it, or how seriously it might be regarded, nor was Mr. Cerrato questioned about the threat or the source of his information. To sustain the argument would be to rely on what may prove to be pure rumor, wholly lacking in substance. The appellant's characterization of

512

the information itself as *possibly* exculpatory suggests that likelihood. It is the appellant's burden to demonstrate prejudicial error, not merely to allege it. *Berna v. State*, 282 Ark. 563, 670 S.W.2d 434 (1984).

■■■■■ Secondly, appellant did not seek any of the sanctions provided for in A.R.Cr.P. Rule 19.7, such as a continuance, choosing instead to ask only for a mistrial, the most extreme recourse open to a trial court. A mistrial is to be avoided except where the fundamental fairness of the trial itself is at stake. We find no abuse of discretion in the denial of a mistrial.

### Holmer Statement

■■■■■ The other claim of exculpatory information involves a statement of John Thomas Holmer. At an omnibus hearing the defense alleged the state was withholding a statement by Holmer, inferring the statement was exculpatory. The state categorically denied the claim and said it had not decided whether to call Holmer as a witness. The state alleged Holmer and the defense were in direct communication, which was not refuted. The issue was resolved, to the apparent satisfaction of both sides, when the defense proposed simply that the trial judge examine Holmer's statement during the trial. The trial judge did that in chambers and said it was free of any exculpatory information. At this point the defense asked that it be appended to the record for purposes of review, which the trial judge declined to do commenting that he lacked the authority to order the state to deliver the statement. Presumably he was relying on Ark. Stat. Ann. § 43-2011.3(a) (Repl. 1977)[1] which requires the state to furnish statements to the defense only when it calls that individual as a witness and presents his testimony to the jury. Inasmuch as Holmer was not called by the state there was no obligation to supply a statement, unless it contained information which negates the defendant's guilt.

---

[1] (a) In any criminal prosecution brought by the State of Arkansas no statement or report in the possession of the state which was made by a state witness or prospective state witness (other than the defendant) to an agent of the state shall be subject of [to] subpoena, discovery, or inspection *until said witness has testified on direct examination in the trial of the case.* (Our italics).

Ordinarily we would leave it to the parties to move that the record on appeal be supplemented under ARAP Rule 6(e), which the appellant has not done. However, inasmuch as this is a capital felony murder case in which the death penalty was imposed, we issued a writ of certiorari to the trial court to include the statement of John Thomas Holmer which the appellant claims is exculpatory. That writ has been returned and the added material has been reviewed. We agree with the trial court, the statement is entirely free of any information tending to negate the guilt of Richard Wayne Snell.

### Miranda Warnings Given to Defense Witness

Appellant next contends "the trial court erred by commenting on the weight of the evidence and credibility of defense witness Stephen Scott by advising him of his Miranda rights in the presence of the jury."

Before counsel began questioning this witness the trial judge said, "Mr. Scott, are you familiar with your Miranda—." Counsel interrupted to object to the warnings being given in the presence of the jury. The jury was excused and the remainder of the warnings were given. We don't regard this unfinished remark as a comment on the weight of the evidence or on the credibility of the witness. Earlier, the Miranda warnings had been given to a witness for the state at the request of defense counsel. Even if the jury sensed the purpose of the words we do not believe a mistrial was warranted. As we have often said, mistrial is a drastic remedy and not to be readily applied. *Combs* v. *State*, 270 Ark. 496, 606 S.W.2d 61 (1980). It should be granted only when the trial cannot in fairness continue.

### Cross-Examination of Tim Russell

Appellant makes a general allegation of error in connection with defense witness Tim Russell — "[o]ver numerous objections by defense counsel the trial court allowed the state on cross-examination to elicit testimony about the witnesses grandfather, the grandfather's activities, their relationship and correspondence, details of prior convictions of the witness, the witness' firing of automatic weapons and hand grenades." Appellant contends that hearsay and prejudicial proof was admitted as a

result of the error.

Tim Russell testified for the defense that he began living at "the farm" (referring to the encampment of an organization known as The Covenant, The Sword and The Arm of the Lord, or CSA) in February 1982. He said Wayne Snell came there around October 30 of that year.

On cross-examination the state asked Russell without objection if his grandfather was active in the CSA. He answered, "No, sir." When the prosecutor asked if the grandfather had been arrested by federal authorities the court properly sustained an objection. Over an objection as to relevance, the state was permitted to ask whether the grandfather was sympathetic to the CSA. The question had no conceivable relevance, but neither it nor the answer, which was "no," had any particular importance one way or the other.

At a later point the witness was asked whether he had attempted to get a note out of the encampment to his grandfather, which he at first denied and then admitted. Over an objection as to relevancy, the witness quoted the note, "Dear Grandpa, they have blockaded us and the war is on." Inasmuch as he had earlier denied being at the encampment when federal officers raided it, the question had relevance as to credibility and fell within the court's discretion. *McCorkle* v. *State*, 270 Ark. 679, 607 S.W.2d 655 (1980). The witness was questioned about CSA activities and about pending charges against him related to those activities, but we think those questions, touching on bias, were a proper subject for cross-examination.

We have examined the entire testimony on direct and cross and see no reason to elaborate further. Some of the questioning was probably remote to the issues of the trial, but not beyond the trial court's discretion.

### Testimony of Bennie Avery

Another point of error concerns defense witness Bennie Avery, who went with Steve Scott and Wayne Snell to the CSA encampment in October of 1983. Avery said he visited the camp about four times and was sympathetic to some but not all CSA causes. Over objection Avery was questioned on cross-examina-

tion about the CSA, its members and practices and whether he had signed a non-surrender pact with CSA.

■ Appellant has not pointed to any particular question or answer as constituting reversible error. However, we have examined the record of Mr. Avery's testimony. There were five objections by the defense to questions by the prosecutor. Asked if he knew David McGuire, a member of CSA, the witness was permitted to answer over a relevancy objection. He said he did not. Having testified that he, Snell and James Ellison went to a gem show in Arizona in 1983, he was asked over objection if their purpose in going there was to commit a robbery. He answered no. He was asked it he had ever seen "this pistol" (presumably the .45 or the Ruger, the record doesn't distinguish). He said he had not. When asked what he bought or sold in Arizona an objection was made and, though overruled, the question went unanswered. One objection was not made until after the witness had answered the question and the question concerning the non-surrender pact was not objected to. Given the latitude of cross-examination allowable under the trial court's discretion, no abuse is demonstrated by these rulings. *McCorkle* v. *State, supra.*

### Testimony of Kent Yates

Again, without citing specific objections, appellant argues generally that irrelevant and prejudicial testimony concerning the CSA was elicited by the state from its witness, Kent Yates. Appellant contends he was not a member of CSA and had nothing to do with CSA activities. Whether appellant was formally a member of CSA does not concern us. Whatever his status, he was plainly involved in the movement and his actions were consistent with its methods and purposes. He cannot escape accountability simply by refuting actual membership.

As to the claim Snell had nothing to do with CSA activities, the proof is decidedly to the contrary. Kent Yates lived at the CSA encampment for some ten months under the name Lonnie Robinson. He identified the .45 calibre automatic as belonging to Snell. Yates said he had installed a coupler on the pistol at Snell's request and had removed the serial numbers at the request of Jim Ellison, a CSA elder.

Yates also recognized the Ruger .22 calibre pistol as

belonging to Snell and said it was he who made and installed the silencer. He said Wayne Snell had used his wife's blue Mercury automobile for a period of time, upon an understanding that Snell would make the monthly payments. The Mercury was used by Snell, and the others in the Texarkana robbery.

Yates said he, Snell and other CSA members went to Springfield in two groups for the purpose of robbing a pawnshop, discussing the murder of the proprietor if that became necessary. The robbery was to be at 1:00 p.m., but the other group arrived too late and the plan was abandoned. Appellant cites A.R.E. Rules 401 and 402 defining relevant evidence as having any tendency to make a fact in issue more probable or less probable than it would be without such evidence. Rule 402 provides simply that all relevant evidence is admissible.

We do not suppose evidence concerning the activities of the CSA was not harmful to the defense. The organization by its very nature places itself at odds with conventional society. Criminal acts aside, its obsession with weapons, its urge to isolate and prepare militarily for an invasion by unidentified enemies, could hardly inure to the defendant's good. But we believe in the context of this case such proof was relevant and had a probative value which addressed itself to the trial court under A.R.E. Rule 403 and was not substantially outweighed by the prejudice.

█ Kent Yates's testimony concerning the two pistols and their connection with Wayne Snell unquestionably makes the fact more probable than not that the pistol used to kill William Stumpp belonged to Snell and supports the premise that the .45 calibre weapon was obtained in the robbery of William Stumpp.

█ The aborted robbery at Springfield and the robbery at Texarkana bore enough similarities to justify the proof of the former as indicative of motive, intent, preparation and plan concerning the latter. A.R.E. Rule 404(b). Both involved pawnshops, both were scheduled for 1:00 p.m., when Snell considered business activity to be at its lowest ebb, the execution of the proprietor was intended in both and both were planned by Snell.

█ Moreover, testimony about other CSA methods was admissible under A.R.E. Rule 404. Such evidence, is admissible to prove the existence of a larger plan, scheme, or conspir-

acy, of which the crime on trial is a part. This will be relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, or his intention. (McCormick on Evidence (3rd Ed.) Chap. 17, p. 558).

While Snell was not shown to be a member of CSA, he was described as a sympathizer. He stayed frequently at the camp and the CSA benefited by his actions. Thomas testified the Texarkana robbery was to get money for the CSA. The serial numbers from the .45 calibre pistol were removed at the CSA camp by a CSA member at James Ellison's instruction and the same CSA member made silencers for the .45 and earlier for the .22 Ruger used to kill Stumpp. Finally, using the car of a CSA member, Snell and the other two CSA members returned to the CSA camp soon after the robbery where the jewelry was divided by Snell and James Ellison, with other CSA members receiving particular items of jewelry.

Two cases involving facts very similar to the facts of this case are *United States* v. *Mills*, 704 F.2d 1553 (11th Cir. 1983) and *United States* v. *Harrell*, 737 F.2d 971 (11th Cir. 1984). In *Mills*, the appellant was convicted of the murder of a fellow prisoner. The prosecution was permitted to prove other crimes and activities by an organization in and outside the prison known as the "Aryan Brotherhood" in order to show the context, motive, and function of the organization. The opinion recognized the covert nature of the organization and the necessity of proving its methods in drug traffic and the intimidation of other prisoners. The court held the probative value was not exceeded by the prejudice.

In *Harrell*, the appellant complained that his conviction of drug charges was prejudiced by proof relating to the methods and practices of a motorcycle gang (the Tampa Outlaws Motorcycle Club), admittedly synonymous with criminal misconduct. A former member of the gang testified that no member had a legitimate job, describing illicit activities involving drugs and prostitution, and told of similar activity. The proof was upheld under 404(b).

For the same reasons the testimony of William Thomas concerning CSA weapons, arson and criminal conduct in general

by CSA members, is admissible.

## Testimony of Johanna McGuire

Johanna McGuire was called by the state to testify that her husband, a CSA member, gave her a gold ring with two large diamonds and seven smaller ones, which came from William Stumpp's pawnshop. Mrs. McGuire was permitted to testify over appellant's repeated hearsay objection that she was told by her husband the ring came from Wayne Snell.

No doubt the objection was proper, but the error affords no basis for reversal as the identical information was provided in the testimony of David McGuire. He said the ring was given him by Snell after Jim Ellison gave his approval. McGuire said Snell had a whole sack of rings for him to choose from. Mrs. McGuire's testimony was merely cumulative; it could hardly be thought to have had a substantial effect on the rights of the appellant. A.R.E. Rule 103.

## Constitutionality of the Death Penalty

The final point for reversal is a generalized challenge to the constitutionality of the death penalty by appellant acting pro se. It is said to be: a) cruel and unusual, b) without substantive sentencing review, c) fails to require sentencing review on the whole record, d) lacks comparative, proportionality review; e) that life without parole is a sufficient deterrent, f) fails to deter other homicides; g) is without penological justification; and h) is vague, arbitrary and overbroad. These assertions are wholly conclusory and without supporting authority. We find no merit in them. *Weaver* v. *State*, 271 Ark. 853, 612 S.W.2d 324 (Ct. of App. 1981); *Dixon* v. *State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

Pursuant to our Rule 11(f) we have reviewed the entire record for objections and for rulings adverse to the appellant. No grounds for reversal are found. Moreover, we have considered this death sentence on a comparative basis as we have done by volition in other cases (See *Ruiz and Denton* v. *State*, 280 Ark. 190, 655 S.W.2d 441 (1983); *Pulley* v. *Harris*, 465 U.S. 37 (1984).) We find no reason to lessen the penalty imposed by the jury. The

evidence is undisputed that the murder was committed by Wayne Snell intentionally in furtherance of the robbery and to deter apprehension, which it accomplished for a considerable period. The proof supports the conclusion that William Stumpp was shot twice behind the left ear while engaged in opening his safe, and a third shot was fired into the base of the skull as he slumped to the floor. There is nothing to suggest resistance, nor could a more deliberate murder in the course of a felony be conceived.

### Evidence of Guilt Overwhelming

In closing, the evidence that Richard Wayne Snell was guilty of the crime with which he was charged in this case is so clear and convincing that we can say with assurance the proof of his guilt is overwhelming. One of the participants in the robbery, William Thomas, a disillusioned CSA elder, testified that he, Snell and Stephen Scott drove to Texarkana in the blue Mercury belonging to David McGuire's wife; they parked behind the pawnshop at 1:00 p.m. and after checking the Ruger pistol to make sure it was loaded, Snell entered the pawnshop, followed by Scott. When they returned Scott was carrying a box of weapons and Snell his brief case, containing $90 and a large quantity of jewelry. Snell told Thomas he shot Stumpp as he turned his back to open the safe. Snell said he inadvertently left a distinctive silver watch fob on Stumpp's scale which was introduced at the trial and identified as belonging to Snell. The murder weapon, a ring and the .45 calibre pistol stolen in the robbery were clearly tied to Wayne Snell. David McGuire testified he tried to trade his pistol for the .45 calibre pistol but that Snell refused, telling McGuire "there was dead man laying behind that pistol." In short, the proof of guilt is overwhelming, hence, the requirement of prejudicial error increases accordingly. *Novak* v. *State*, 287 Ark. 271, 698 S.W.2d 499 (1985). Even constitutional errors may be cured where the proof of guilt is so convincing that it can be said the error is harmless beyond a reasonable doubt. *Harrington* v. *California*, 395 U.S. 250 (1969).

Having studied the record in full we are persuaded it is reasonably free of error and that appellant received a fair trial.

Affirmed.

PURTLE, J., dissents.

JOHN I. PURTLE, Justice, dissenting. At the outset I will state that this trial is the most one-sided proceeding that I have ever reviewed. Almost without exception each objection by the state was sustained and each objection by the defense was overruled. The appellant was not only tried for the murder of Bill Stumpp, he was also tried a second time for the murder of state trooper Bryant, and, additionally, for plotting a robbery in Missouri that never occurred, and for knowing the activities of the CSA.

At the time of this trial, the atmosphere in southwest Arkansas was charged with hostility. There was a hue and cry for revenge because a loved and respected trooper had been gunned down and four more officers had died in an accident on the way to the funeral. It is no wonder then that the people were vengeful when the murderer of the trooper was about to be tried for the murder of another local citizen. Such is human nature. However, the meanest man on earth is entitled to a fair trial before being convicted. We are, after all, still a nation of laws. That being so, it is my belief that the appellant did not receive a fair trial under the applicable law. The trial resulted in a conviction and a sentence of death. If a jury had been admittedly biased and prejudiced, it could not have inflicted a greater punishment. If given a new trial, free of prejudicial error, the appellant might indeed receive the same sentence. If so, so be it. We will have followed the law.

The motion for change of venue was timely and properly filed. Two affidavits were filed in support of the motion. The state did not file counter-affidavits. Both affiants testified at the hearing on the motion. The first witness was Dennis Chambers, a local attorney. He stated, "I understand for the purpose of the change of venue, Arkansas law requires that I have knowledge through-out the county before the affidavit is made." He explained in detail why he thought that the appellant could not get a fair trial in Miller County. He further testified that this opinion was based on county-wide information. Judy Doolittle, the second witness, stated, "I have discussed this case with people from all over." After this hearing the court found that the witnesses were credible individuals and qualified electors, but that their informa-tion was too "remote." I do not understand the meaning of "remote" as used in this context.

The appellant had filed with the motion numerous newspa-

per stories concerning this trial, himself, the CSA and officer Bryant's murder. The court also heard the testimony of a local television station representative relating to the amount of publicity surrounding the case. The voir dire itself reflects the bias and prejudice that permeated the community with respect to this case.

Without regard to whether the prospective juror was seated, the early questioning by the court reveals the intensity of the feeling which existed in Miller County on the day this trial commenced:

> COURT: Come around and tell us what you know. Tammy Crenshaw.

> PANEL MEMBER: I just know too much about it. Louis Bryant was a good friend of mine, and I knew Bill Stumpp too. I have had business dealings with Bill. I am totally prejudiced.

> COURT: Anyone further. . . .

> J. JOHNSON: [F]rom the papers and all, it leads to a foregone conclusion.

> COURT: I am going to reserve a ruling on your statement until we make individual voir dire. We have one coming up.

> PANEL MEMBER: I would assume everybody is. [This response was apparently directed toward J. Johnson.]

> MEMBER: Officer Bryant's wife and I were classmates — I am close with her and her family.

> COURT: Realizing that that is not their case, but because it's the same defendant. . . .

> MEMBER: [E]xactly. I couldn't really be unbiased in my opinion.

The court excused this member (Wade) and the defense requested that the excused member stay and give testimony on the motion for a change of venue. The court ignored the request and summarily announced, "Mr. Wade is excused." Additional voir dire:

MEMBER: I just feel that people of this caliber is a nuisance to society. I just can't. . .

COURT: You have formed an opinion and cannot be swayed?

MEMBER: No, sir.

COURT: Whatsoever?

MEMBER: No.

COURT: Why, what are you basing that on?

MEMBER: Well, a policeman — well, you might say I am prejudiced —, but for someone to go out and do something — that I have to go out — and work —, I can't go along with those folks.

COURT: Are you basing this on Bryant?

MEMBER: The connection.

COURT: In other words, you are so biased toward the defendant that you could not listen to the testimony from the witness stand. . .

MEMBER: It wouldn't make any difference.

---

DEFENSE: Judge, may I insert at this point I would like the record to reflect that I would like an opportunity to question this man for purposes of pretrial publicity that would be included in our motion for change of venue.

COURT: The Court has dismissed this witness at this point.

COURT: Yes?

STATE: [It] is totally improper he even suggest that a juror can be called and put on the spot like they are attempting to do.

DEFENSE: He said he formed an opinion, and that opinion could only have come about by pretrial publicity. He has heard no evidence in this case and he had already formed an opinion.

---

DEFENSE: May we be allowed to inquire of those witnesses [jurors] that you are inquiring of, ask them some particular questions?

COURT: You may ask leave of the court in each particular witness.

---

DEFENSE: But Judge, say that they have an opinion based on another reason. Can we ask them before they are excused whether or not publicity has had anything to do with that biased opinion? [The record as abstracted shows no response.]

MEMBER: I know trooper Bryant. I just don't think I can be fair with the man.

DEFENSE: Judge, at this time may I be allowed to inquire of Mr. Story?

COURT: I am satisfied with the answers as far as his reasoning, and you are excused, sir.

It is clear the court refused to allow the defense to question any of the panel members concerning the very heart of the motion to change venue. The above exchange was before the entire panel. Individual voir dire took place later. Obviously their excusal by the court placed the testimony of these panel members concerning pretrial publicity beyond the reach of the defense.

The state continued to court the prospective jurors when responding to the defense request to examine the members of the panel concerning bias. The prosecutor stated, "[t]hese people are here to be selected as members of this jury panel and should not be subjected to harrassment in the form of this type question." If such a statement appeared only once in the record, I could not say it was done for the purpose of procuring favor for the state. However, during the course of the voir dire, the prosecutor repeated this statement several times.

The court stated that it intended to allow members of the panel to be questioned in individual voir dire concerning pretrial publicity and bias. However, the court failed to do so. I must again

resort to verbatim quotation of the voir dire:

> COURT: You would then place a burden on the defendant?
>
> MEMBER: Yes.
>
> COURT: Where did you get that idea?
>
> MEMBER: It is because of what I have read in the paper about the situation and the previous case of which he has already been convicted and is on appeal. I just have some strong feelings about it.
>
> COURT: You are excused.
>
> DEFENSE: Your Honor, could we keep her for pretrial publicity?
>
> COURT: She is excused.

Defense counsel once again attempted to question the panel members as to the reason for their prejudice. The court stated that the juror "just dismissed did not in any way cause any prejudice to the defendant inasmuch as she has been excused." The excused member had just presented her views to the remaining members. Her view was that the appellant was as guilty of murdering Mr. Stumpp as he was of murdering officer Bryant. From the record as abstracted it is my opinion that the defense has shown that the appellant did not receive a fair trial. Had the court allowed counsel to question those members of the panel who were excused, the question of the effect of the pretrial publicity might well have been settled conclusively one way or the other. Considering the newspaper clippings, the affidavits, the testimony, and the voir dire of the entire panel, I think justice and fair play dictate the reversal of this case.

Next, I think it was improper for the trial court to inform the jury, even with consent of defense counsel, of the meaning of a sentence of life without parole. I cannot imagine why the majority opinion states: "There is nothing so corrupting in the jury being told about parole that defense counsel can stipulate to a statement of the law being given to a jury and then use it as a means of reversal." Even though defense counsel did consent to this information being given to the jury, the error was not cured by

this consent.

Not only did the trial court mishandle the statement of John Thomas Holmer, the statement was, to some extent, exculpatory. The statement was in the possession of the prosecuting attorney or the local department from the date it was taken, July 15, 1984, to the date of the trial. It was not disclosed by the state in discovery and it was in fact never seen by the defense. The majority opinion alludes to the fact that the appellant and Holmer were in contact with each other up through the trial. I find nothing in the record to support this statement.

I am not at all satisfied with the majority's treatment of the statement of John Thomas Holmer. The opinion implies that the state may take an exculpatory statement from a person and then decide not to call the person as a witness in order to keep the defense from knowing the contents of the statement. My greatest dissatisfaction, however, is the manner in which this matter was handled by the trial court. The defense tried to obtain the statement prior to trial but the state refused to furnish it. During the trial the defense again sought to secure a copy of the statement, which was alleged to be exculpatory. During an in camera hearing the state allowed the trial judge to review the statement. The court refused to allow the defense to look at the statement, instead stating that there was nothing exculpatory in the statement. The court also overruled appellant's request to place the statement in a sealed envelope and attach it to the record. I think it was improper for the court to read the statement and inform the appellant that he would just have to take the court's word that the statement was not exculpatory.

Some of the examples of questions and answers in the Holmer statement are:

Q: He never did specifically mention robbing?

A: No.

---

Q: Has Wayne Snell ever mentioned to you the possibility of robbing Bill Stumpp?

A: No . . . well, he might have, I don't know, he always talked about wild things, he might have.

---

Q: Okay John at this time I would like to show you a watch fob that came from the Pawn Shop on the day of the murder, can you identify it?

A: I don't know . . . he dealt in pocket watches, most of the stuff he dealt in was gold . . . that appears to be silver but he did deal in gold and silver. I don't know.

Q: But you can't say that you've ever seen it in his or Mary Jo's possession?

A: I can't say that positively that I have.

---

Q: Has he ever mentioned the Pawn Shop Murder to you?

Q: Would he mention the pawn shop murder to you?

A: No, he thought I was a federal agent when he first met me.

---

Q: If Wayne Snell did in fact commit the Murder at Joe's Pawn Shop, why do you think he couldn't have gotten rid or sold or destroyed the murder weapon?

A: That goes against everything I have ever seen . . . he always said you steal something or take something like that, never take anything that is serial that can be tied back to you . . . that's why it didn't make a lick of sense to me when I was told that was that weapon.

---

Q: John at this time I would like to show you two 22 weapons that were found in the van with Wayne Snell, see if you can identify either one of them.

A: I've never seen one rigged that way but I have seen a similar weapon.

---

Q: There is no major criminal ring that they are involved in?

A: No, not that I am aware of . . . I don't think so, I really don't. When I first met them I used to smoke pot. I used to do a lot of things but I talked to Jim Ellison about that one time and he said he thought that he was being a servant of the devil.

---

Q: You've never heard them advocate killing?

A: No.

---

Portions of the statement were certainly not favorable to the appellant. However, the defendant should have been allowed to examine the statement made by Holmer.

It is quite clear that the trial court relied on Ark. Stat. Ann. § 43-2011.3, which requires the state to furnish statements to the defense when it calls that individual as a witness. Holmer was not called as a witness. However, the court should have also considered A.R.Cr.P. Rule 17.1(d), which requires the prosecution to disclose to defense counsel any material or information within its knowledge which tends to negate the guilt of the defendant. Rule 19.4 requires that such information be disclosed in time to permit counsel to make beneficial use of it. By approving this tactic on the part of the state, this Court might as well abolish Rule 17 because the state will henceforth decide not to use such witnesses. We will then revert to "hiding behind a log" and "bushwhacking", like we did in the good old days.

In my opinion the most conspicuous prejudicial error occurred when witness Stephen Scott took the stand. The following exchange occurred:

COURT: Mr. Scott, are you familiar with Miranda . . . ?

DEFENSE: (at the bench) Your Honor, can I approach the bench? I object to this man being read his constitutional rights in front of the jury. . . .

COURT: Because he is not represented by an attorney?

DEFENSE: Well, Judge, every witness here is not . . .

STATE: It doesn't matter about what you object to . . .

At this time the jury was removed from the courtroom. How much of the above conversation the panel heard is unknown. The statement of the prosecutor is quoted because it is indicative of the manner in which the trial was prosecuted. As a direct result of the court's sua sponte action, the witness did not testify. Very likely most members of the jury caught the implications of the Miranda warning.

An additional error occurred when a witness for the defendant was extensively cross-examined by the prosecutor about the CSA and its purpose, beliefs and training. The obviously irrelevant questions concerned the activities and beliefs of his grandfather:

> STATE: Your grandfather is involved or sympathetic toward the movement, is he not?
>
> WITNESS: What movement?
>
> STATE: CSA, Posse Comitatus, tax protest?
>
> DEFENSE: Judge, what does this have to do . . . I object, first of all to relevancy.
>
> COURT: I am overruling at this point in time. This is proper impeachment.
>
> DEFENSE: Anything concerning his grandfather is?
>
> COURT: It goes to credibility . . . overruled the objection. . . . The state has assured the court it has relevancy, and I am relying on that.

The prosecution was allowed to prove that the CSA was a group of armed rebellious people who were in constant violation of the law. This same witness was forced to admit that he had been charged with conspiracy to possess automatic weapons and explosives. Such admission was not enough for the state:

> STATE: Would that be hand grenades?
>
> DEFENSE: Your Honor, . . . I . . . object.
>
> COURT: Overruled. . . .
>
> DEFENSE: But not on possessing hand grenades. . . .

STATE: He just testified to conspiracy.

COURT: Overruled the objection.

STATE: Part of that military training was to learn how to fire automatic weapons, was it not?

All of this testimony was admitted over the objection of defense counsel. No doubt defense counsel incurred disfavor with the jury as a result of being forced to object so often. The same question was asked many times. There is no materiality or relavance in any of these questions. The only purpose of such testimony was to inflame the minds of the jury against the defendant. The panel undoubtedly by this time had decided the CSA was quite a bad apple. Another problem with this testimony is that the appellant was not even a member of the CSA. Whether the grandfather of this witness was a shining light in his church or hanged as a horse thief is not relevant to this case.

Another witness, under pending sentence as a racketeer, testified about a lot of criminal and dishonest activities by members of the CSA. A sample is as follows:

STATE: What was the first indication that you recognized that this organization might be something other than a Christian organization?

WITNESS: It took my getting arrested and put into prison . . . Cary Noble would take and add logs to the scale.

DEFENSE: . . . I object.

COURT: I am going to sustain the objection.

STATE: Your Honor, I think that we can show that this entire organization lends itself to the motive and intent of the murder of the pawn shop operator here in Texarkana.

DEFENSE: — Mr. Snell — wasn't a member of CSA . . .

STATE: That will become apparent, Your Honor, throughout the testimony.

COURT: — I will sustain the objection.

STATE: Your Honor, — the point — was changing from a Christian organization —

DEFENSE: Judge, he is not testifying.

COURT: There is a way to ask him that question without so specifically stating. Mr. Thomas what — when first of all did you notice this change and what caused you to believe this?

WITNESS: To accept what they were doing?

COURT: Yes.

WITNESS: As I stated Cary Noble, who was an elder there, would cheat on the scale books.

DEFENSE: Your Honor, I am going to object to this. The court has already ruled on it and he is getting right back into it.

COURT: I would overrule the objection. That was my point, the specific point of getting to cheating on logs. . . .

The court thus made the point that the CSA was a criminal organization clearer to the jury than did the prosecution. The court sustained the defense objection to this line of questioning and then itself proceeded to elicit this information from the witness anyway. If it was proper to sustain the objection, why should the result be different if this information is introduced by the court?

In response to the court's questions, the same witness stated:

As we become more aggressive we began to collect weapons. We constantly lived under the pressure that we were going to be raided from the government because of the illegal weapons we had.

---

We had a lot of mini 14's, 2.3 caliber, H&K 308's, 45 handguns, .22's, 9 millimeter handguns — this was basically what we had at first. We eventually got into automatic weapons, converting the weapons we had.

The irrelevant testimony reached its most prejudicial point in a series of questions relating to CSA plans to rob a pawnshop in Springfield, Missouri, and to murder the owner because he was

Jewish. The robbery never took place. I cannot refrain from quoting at length:

> STATE: What was the plan prior to arriving in Springfield?
>
> A: The plan how we would do it was to, Wayne would go into the pawnshop with his briefcase, and he would get the store keeper talking about gold and buying gold and what have you, and jewelry, and Wayne would bring out some interesting pieces of jewelry, watches, — shortly thereafter, Yates and Scott were to come in behind them and they were going to be carrying a time device that would blow up after they robbed the store.
>
> STATE: What did you plan to do with the occupants of the store?
>
> WITNESS: They were going to kill her.
>
> STATE: What was the bomb device to do?
>
> WITNESS: To burn it down.
>
> STATE: To cover the evidence?
>
> WITNESS: Yes, sir.
>
> STATE: What type religious affiliation did these people have?
>
> WITNESS: Jewish.
>
> STATE: Was there something about the doctrine of the CSA involving Jewish people?
>
> WITNESS: Yes, sir.
>
> DEFENSE: Your Honor, — object. . .
>
> STATE: I think Your Honor, we can show the relevance that they were intending to go rob and murder the pawnshop operator because they were of the Jewish persuasion.
>
> COURT: Overrule your objection. You may proceed.

The record is replete with similar testimony. The proof of the

impact of this evidence is in the sentence received by the appellant — death by lethal injection. This sentence could easily have been predicted. The appellant was already under a sentence of life without parole for the murder of a state policeman. The jury was admittedly aware of the appellant's conviction for this crime. The only additional sentence that could have dispensed any retribution for this crime was that which was pronounced in this case.

Guilt by association should not be condoned by the courts. Even if such evidence had relevance the prejudicial effect greatly outweighed the probative value. A.R.E. Rule 403. An accused is entitled to a fair and impartial trial, before a qualified jury, on the specific offense with which he is charged. This trial should have been tried in another county, even if outside the judicial district. See *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982). The constitutional right to a fair and impartial trial is so fundamental that the place of the trial becomes secondary.

I would reverse and remand this case because of the specific errors discussed above. However, this is a case where the totality of the circumstances or cumulative effect of the errors requires reversal.

Supplemental Opinion on Denial of Rehearing
Delivered February 9, 1987

723 S.W.2d 1

PER CURIAM. ■ By petition for rehearing Richard Wayne Snell offers three reasons for a reversal of his conviction for capital felony murder. Two of the asserted grounds (the admission of evidence concerning the Covenant, Arm and Sword of the Lord and the fact the jury was told the meaning of life without parole) were argued previously and will not be discussed

anew. See Rule 20(g) of the Rules of the Supreme Court and Court of Appeals.

The remaining point, which was not raised in the trial court nor in this court prior to the petition for rehearing, concerns the issue of double counting. In *Collins* v. *Lockhart*, 754 F.2d 258 (8th Cir. 1985) the Eighth Circuit Court of Appeals vacated the death penalty of Carl Albert Collins because one of the aggravating circumstances, murder for pecuniary gain, duplicated one of the elements of the crime itself, murder committed in the course of a robbery. The duplication was held to be a violation of the 8th and 14th Amendments to the United States Constitution. See also *Woodard* v. *State*, 806 F.2d 153 (8th Cir. 1986) and *Ruiz* v. *Lockhart*, 806 F.2d 158 (8th Cir. 1986).

However, we have never decided the issue and do not do so here because there was no objection on that ground to the jury instructions at trial and no argument to that effect in the initial appeal. Few rules are as settled as the fundamental rule that we will not consider an argument for reversal in the absence of an appropriate objection in the trial court. *Fretwell* v. *State*, 289 Ark. 91, 98, 718 S.W.2d 109 (1986). We find no basis for an exception in this case. *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

Petition for rehearing denied.

GLAZE, J., not participating.