## COMMONWEALTH *vs.* KENAN YESILCIMAN.

Norfolk. December 4, 1989. - February 22, 1990.

Present: LIACOS, C.J., ABRAMS, NOLAN, O'CONNOR, & GREANEY, JJ.

*Homicide. Search and Seizure,* Warrant. *Practice, Criminal,* Motion to suppress, Argument by prosecutor. *Evidence,* Scientific test, Relevancy and materiality.

On appeal from a murder conviction the defendant demonstrated no "clear error" in the judge's resolution of conflicting testimony, offered at a hearing on the defendant's motion to suppress evidence, or in his subsidiary finding that the search of the defendant's home and garage had not commenced before the issuance of a search warrant; thus the defendant's motion to suppress was properly denied. [742-743]
At a murder trial there was no error in permitting expert testimony that certain visible stains on the defendant's dungaree jacket were bloodstains even though it could not be determined whether of human or animal origin. [744-745]
At a murder trial, the prosecutor's argument on the issue of the defendant's credibility, while "extravagant," did not create a substantial likelihood of a miscarriage of justice. [745-746]

INDICTMENT found and returned in the Superior Court Department on November 5, 1987.

A pretrial motion to suppress evidence was heard by *Robert T. Mulligan,* J., and the case was tried before *Roger J. Donahue,* J.

*Stephen Hrones* for the defendant.

*James F. Lang,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree, the defendant, Kenan Yesilciman, appeals. He alleges error in (1) the denial of his motion to suppress evidence seized from his home and garage; (2) the denial of his motion to strike the testimony of one of the Commonwealth's chemists; and

(3) the closing argument of the prosecutor. He also asks that we exercise our power under G. L. c. 278, § 33E, to order a new trial or enter a verdict of a lesser degree of guilt. We affirm the defendant's conviction. We conclude that there is no reason to exercise our power under § 33E.

We summarize the facts the jurors could have found in the light most favorable to the Commonwealth. See *Commonwealth v. Amado*, 387 Mass. 179, 186 (1982).[1] On Sunday morning, September 27, 1987, the body of a sixteen year old woman, the defendant's former girl friend, was discovered in Pagent Park in Quincy. The victim's face was bruised, battered, abraded, and covered with blood. A tire iron was found nearby.

The victim and the defendant had been dating for over one year when the victim broke off the relationship over the Labor Day weekend in September, 1987. Shortly thereafter, the victim began dating John Bono, a friend of the defendant. On the evening of Friday, September 25, the defendant had a gathering at his house, where he lived with his parents. There, he first heard about the victim's new relationship, and he became very angry. He said that he wanted to find John Bono and beat him up. He expressed rage at the victim.

The defendant did not hesitate to act on his anger over the victim's new relationship. When the party broke up, the defendant went to John Bono's house and waited outside in an effort to observe Bono with the victim. After seeing the two together, the defendant followed Bono, engaged him in an argument, and beat him up, breaking Bono's jaw. The following morning, the defendant accused a friend of the victim, Kim Kenney, of concealing the relationship between Bono and the victim. He then threatened her with an armed crossbow.

---

[1]We use as the standard in setting forth the facts the same standard that we use in determining the correctness of the denial of a motion for a required finding of not guilty. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979). The defendant does not argue that the evidence was insufficient.

Saturday afternoon at approximately 1:30 or 2 P.M., the victim left her house to run an errand. When the victim had not returned by Saturday evening, the victim's mother telephoned several of the victim's friends in an effort to find her and then reported her daughter missing. After the body was discovered on Sunday, the news spread through the neighborhood. Around noon, Kim Kenney called the defendant to inform him that his former girl friend's body had been discovered in Pagent Park. She told him that someone had hit the victim in the back of the head. After the telephone call, the defendant was upset and told two friends who were at his house that someone "had beat his baby's face in." No information had yet been released by the police concerning the nature of the victim's injuries or the cause of her death.

The defendant and several of his friends gathered to discuss the victim's death. They agreed to go together to the police station and offer their help. At the police station, the defendant made statements to various police officers over the course of several hours. He admitted to the police his relationship with the victim, including his anger at her for dating Bono, and he gave accounts of his activities and whereabouts over the weekend. He told the police that the victim should suffer for what she had done to him.

The police searched the defendant's house and automobile pursuant to a warrant and obtained some incriminating evidence. See section 1, *infra.* Serological tests were performed on all the items removed, including some articles of the defendant's clothing, and on the defendant's automobile. Tests also were performed on the tire iron found near the body. The tests revealed blood on the defendant's dungaree jacket and in his automobile, although it could not be determined whether the blood was human or animal in origin. Human blood and two of the victim's hairs were found on the tire iron. There were no fingerprints on the tire iron.

On October 2, the defendant was arrested pursuant to a warrant. As he was being taken to the police station, the defendant stated to one of the detectives, "Have you guys been

able to figure out the last time I drove my car?"[2] He also stated that he knew that the police would be coming for him.

Expert evidence indicated that the victim was killed between six and eighteen hours before she was pronounced dead at 10:45 A.M. on Sunday, September 27. A neighbor of the defendant's stated that she saw the victim knocking at the defendant's window at about 4 P.M. on Saturday; two other witnesses testified that at about 4 P.M. on Saturday, they saw the victim walking with a man whom one of them was later able to identify as the defendant from a photographic array. Two students at a local school testified that they were walking through Pagent Park between approximately 3:30 and 4:45 P.M.,[3] and saw a man attempting to lift up the motionless body of a woman. One of the students identified the defendant as the man he saw with the woman's body.

Two of the defendant's friends said that they were unable to reach him by telephone on Saturday afternoon. Several times, the defendant's father answered the telephone and said that the defendant was not at home. The defendant went to a party with his friends that night. One of them drove him home at about 10:30 P.M.

Two women testified that they drove up to Pagent Park Saturday night at about 11 P.M. There one of them noticed a dark automobile with certain distinctive features that "look[ed] like" the defendant's automobile.[4] They testified that they fled when something was thrown at them from the woods. A young man testified that at about 5 A.M. on Sunday,

---

[2] At trial, the Commonwealth elicited from the defendant's friends testimony to the effect that the defendant's license had been suspended and that consequently he did not keep his registration plate on his automobile, which he kept in his garage. One of the defendant's friends said that on Saturday the registration plate was off, while on Sunday morning the registration plate was on the automobile.

[3] The witnesses differed in their estimates of time. One stated the time to be between 3:30 and 4 P.M.; the other between 4 and 4:45 P.M.

[4] The defendant owned a black 1985 Trans Am automobile with a custom-built Daytona hood, a Fiero GT spoiler, rear window louvers, and black wheel rims.

he drove to Pagent Park with his girl friend. He noticed in the park an unusual automobile. He later identified the defendant's automobile as the one he saw in Pagent Park early that Sunday morning. As he and his girl friend sat in his automobile, he noticed a man wearing a dungaree jacket looking in the window. This witness subsequently picked out the defendant's photograph from an array. He also identified the defendant at trial. At approximately 9 A.M. on Sunday morning, a former schoolmate of the defendant saw the defendant, wearing a dungaree jacket, riding through Pagent Park on a moped.

The forensic pathologist who performed the autopsy found eight distinct wounds on the victim's head and neck, each splitting the skin to the skull. Internal examination revealed a skull fracture and brain contusion and hemorrhaging. The pathologist determined that the cause of death was multiple blunt injuries to the head and neck; he opined that the victim died soon after the injuries.

The defendant offered an alibi defense. His father, his mother, and his two siblings said that he was at home during Saturday afternoon and on Saturday night after he returned from the party at 10:30 P.M. Neighbors stated that they had not heard the sound of the garage door opening or the sound of the defendant's automobile. The defendant himself said he was at home, although his testimony was inconsistent with that of other alibi witnesses concerning some collateral matters.

1. *Motion to suppress.* In a pretrial motion to suppress, the defendant alleged that the search of his residence and automobile commenced before the issuance of the search warrant.[5] He argues that the motion judge erred in denying the motion and that the judge's findings were not supported by the evidence. We disagree.

---

[5]The defendant does not argue that the search warrant itself was defective in any way. He has not included the warrant affidavit or the motion to suppress in the record. Because he failed to include the warrant affidavit in the record, any issues relating to it are deemed waived.

The judge found that the defendant and three friends went to the police station at about 2 P.M. "to learn what they could about the grisly discovery and to provide what information they could to the police." The four spoke to different officers. Because the defendant "was the ex-boyfriend of [the] victim . . . [the officer] thought it prudent to give [the defendant] his Miranda rights before speaking with him." The defendant made some "quasi-incriminating statements, including a bone chilling one concerning the condition of the victim's face." The officers observed grass stains on the knee area of his blue jeans and "what appeared to be blood droplets on his sneakers." He told the officers that he had worn the sneakers and jeans the previous day.

At about 7:45 P.M., some police officers were dispatched to the defendant's home "to secure the premises." The judge found that one officer was invited into the defendant's first-floor apartment and another officer who was acquainted with the second-floor tenant was invited into that apartment. The police officers who testified at the suppression hearing never pinpointed the time at which they began the search, but their testimony permitted the judge to infer that the search was conducted after the warrant was obtained.

It is uncontested that the warrant was issued at approximately 9 P.M. on Sunday, September 27, 1987. The police officers stated that after the warrant was procured, they first seized items of clothing from the defendant. This seizure took place between 9:30 and 10 P.M. Other officers took the warrant and began searching the house. One of the officers said that he read the warrant in the police department's parking lot before leaving to search the defendant's home.

The defendant, whose clothing had been seized at the police station, returned home at 10:30 P.M. He arrived during the search of his basement bedroom. He attempted to prevent the police officers from gathering certain items of his clothing and attempted to impede the search of his automo-

bile. As a result, the automobile was towed to the police station at approximately 11 P.M.[6]

The return of the search warrant listed the date and time of the search as September 27, 1987, at 10:45 P.M. It also contained a sworn declaration by Detective William Lanergan of the Quincy police department that all the items were seized "pursuant to" the warrant. The judge specifically found that "[n]o search of the premises, the garage or Trans Am automobile was conducted prior to the issuance of the warrant."

The defendant presented the testimony of his father and two upstairs neighbors to show that the search began before the issuance of the warrant. His father, Osman Yesilciman, testified that after going to the police station to locate his son, he returned home at 8:05 P.M. to find a virtual army of police officers "tearing down" his house. He asked an officer if there was a search warrant, and the officer replied, "We are going to get a copy of it." The defendant's upstairs neighbors, who rented their apartment from the defendant's father, said that several police officers arrived at the house at approximately 7:45 P.M. They were able to specify the time because the "latter half" of the "Sixty Minutes" television program was then being broadcast. They testified that they saw these officers going in and out of the house and garage but did not see anything being removed. The defendant's father was the only witness who specifically averred that the search began before 9 P.M.

The defendant contends that the motion judge's findings were not supported by the evidence, because the testimony of the defendant's father and the two upstairs neighbors was "specific, corroborated, and demonstrates that the search of defendant's home and garage was in progress before the police obtained the search warrant."

---

[6]It was proper for the police to tow the defendant's car to the station once he interfered with their search. "[I]n some circumstances it may be necessary to delay a search until it can be done in a safe, convenient, and risk-free place." *Commonwealth* v. *Markou*, 391 Mass. 27, 30 (1984).

In reviewing the denial of a motion to suppress, we accept the motion judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Cunningham,* 405 Mass. 646, 655 (1989); *Commonwealth* v. *Melvin,* 399 Mass. 201, 204 (1987); *Commonwealth* v. *Jones,* 375 Mass. 349, 354 (1978). The defendant's contention that the testimony he presented was specific and mutually corroborating is insufficient to show clear error. On a motion to suppress, "[t]he determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses, and not this court." *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980); accord *Melvin, supra* at 204; *Commonwealth* v. *Doyle,* 377 Mass. 132, 138 n.6 (1979); *Commonwealth* v. *Gutierrez,* 26 Mass. App. Ct. 42, 45 (1988). The motion judge was entitled to credit the testimony of the police officers over the testimony of the father.[7] "The clear error standard is a very limited form of review. . . . Where there has been conflicting testimony as to a particular event or series of events, a judge's resolution of such conflicting testimony invariably will be accepted." *Commonwealth* v. *Spagnolo,* 17 Mass. App. Ct. 516, 517-518 (1984).

The fact that police arrived at the premises prior to the issuance of the warrant does not aid the defendant. It is clear that police officers may secure an area to be searched before a warrant is procured, see *Commonwealth* v. *Hall,* 366 Mass. 790, 803 (1975), as long as the search does not commence before issuance of the warrant. See *United States* v. *Jeffers,* 342 U.S. 48, 52 (1951); *United States* v. *Goldenstein,* 456 F.2d 1006, 1010 (8th Cir. 1972), cert. denied sub nom. *Ray* v. *United States,* 416 U.S. 943 (1974). See generally Note, Police Practices and the Threatened Destruction

---

[7] Although the testimony of the defendant's upstairs neighbors was somewhat helpful to the defendant, their credibility was diminished when one of them testified that she saw the defendant's car being towed from his house at approximately 8:15 P.M. Both the defendant and the police officers testified that the car was not towed until approximately 11 P.M.

of Tangible Evidence, 84 Harv. L. Rev. 1465, 1474-1476 (1971).[8]

2. *Admission of serological testing evidence.* Paul Zambella, a chemist at the State crime laboratory, testified that serological testing revealed occult blood on the steering wheel, gear shift, and emergency brake handle of the defendant's automobile. He also testified that certain visible stains on a dungaree jacket seized from the defendant were blood, although he was unable to determine whether the blood was human or animal in origin. Another chemist testified that the reason that the blood could not be determined whether to be of human or animal origin was that "the stains appeared to have been tampered with . . . " and that the "jacket was probably washed in hot water and possibly with some sort of detergent." The defendant moved to strike Zambella's testimony "because there was nothing in the testimony that is tied up to this defendant." The judge denied this motion. The defendant argues that Zambella's testimony should have been struck because it was irrelevant and unduly prejudicial.

In order to be considered admissible, evidence "need not establish directly the proposition sought; it must only provide a link in the chain of proof." *Commonwealth* v. *Tobin,* 392 Mass. 604, 613 (1984). See *Commonwealth* v. *Fayerweather, ante* 78, 83 (1989); *Commonwealth* v. *LaCorte,* 373 Mass. 700, 702 (1977). The evidence was relevant to the issue whether the defendant was the perpetrator. Other evidence introduced at trial made it clear that whoever committed the crime would have gotten blood on himself or on his clothing. Therefore, evidence that there was blood in the defendant's car and on an item of his clothing was a link in the chain of

---

[8]The major focus of the motion to suppress was the suppression of the defendant's statements. On appeal, he does not argue any error in the denial of the motion on that ground or in the admission of the statements. Thus, any error in the admission of the statements is deemed waived. See *Commonwealth* v. *Cundriff,* 382 Mass. 137, 150 n.22 (1980). See also Mass. R. A. P. 16 (a) (4). Pursuant to our duty under G. L. c. 278, § 33E, we have reviewed the judge's findings and rulings on voluntariness and on waiver of rights protected by the Miranda warnings. We conclude that the judge's findings are amply supported by the evidence.

proof of his identity as the perpetrator of the crime. "The defendant's argument goes only to the weight of the evidence, not to its admissibility, and it is for the jury to determine — after listening to cross-examination and the closing arguments of counsel — what significance, if any, they will attach to the discovery" of blood on the defendant's possessions. *Id.* Cf. *DeJesus* v. *Yogel,* 404 Mass. 44, 47 (1989); *Commonwealth* v. *Hogg,* 365 Mass. 290, 294-295 (1974). Indeed, the defendant's trial lawyer made full use of his opportunities on cross-examination and at closing argument to point out that the blood was not necessarily the victim's and could have been months old.

The defendant nonetheless argues that it "would be highly speculative and improper for the jury to draw an inference that the alleged blood was human, let alone that of the victim." We disagree. "Evidence is not rendered prejudicial merely because it is inconclusive. It is axiomatic that it is for the jury to determine the probative value to be accorded relevant evidence." *Commonwealth* v. *Benoit,* 382 Mass. 210, 221 (1981). In *Benoit,* we held that there was no impropriety in the admission of bloodstained items, even though the blood type detected on the items was a type shared by the victim, the defendant, and a "large segment of the world population." *Id.* at 221. Similarly, in *Commonwealth* v. *Carrion,* 370 Mass. 408, 412 (1976), we determined that there was no error in permitting testimony to the effect that a defendant's clothing "contained red stains," even though this testimony, in itself, was inconclusive. *Id.* There was no error in the denial of the motion to strike.

3. *The prosecutor's closing argument.* In closing, the prosecutor commented upon the credibility of the defendant's testimony as follows: "Again, that goes to the issue of credibility. *I suggest to you he couldn't tell the truth if his life depended upon it.* But that's for you to decide, ladies and gentlemen, not me. But everybody is wrong except Kenny Yesilciman. But he is contradicted by all these different witnesses, not one but six or seven." (Emphasis added.) The defendant did not object. Nevertheless, the defendant now ar-

gues that the statement, "I suggest to you he couldn't tell the truth if his life depended upon it" is an improper assertion of personal opinion on the part of the prosecutor and was so prejudicial as to rise to the level of a "substantial likelihood of miscarriage of justice." *Commonwealth* v. *Ciampa, ante* 257, 268 (1989). See G. L. c. 278, § 33E. We disagree.

In analyzing a claim of improper argument, "the prosecutor's remarks must be viewed in light of the 'entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial.' " *Commonwealth* v. *Lamrini*, 392 Mass. 427, 432 (1984), quoting *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984). Immediately after making the questionable statement, the prosecutor added, "But that's for you to decide . . . not me." The statement occurred in the course of an otherwise unobjectionable closing to which the defendant, indeed, did not object. Furthermore, the judge instructed the jury that closing arguments are not evidence. A "certain measure of jury sophistication in sorting out excessive claims on both sides may fairly be assumed." *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987).

Unquestionably, a prosecutor may argue that defense witnesses, including the defendant, are not credible. *Commonwealth* v. *Andrews*, 403 Mass. 441, 457 (1988); *Commonwealth* v. *Smith*, 387 Mass. 900, 906-907 (1983); *Commonwealth* v. *Cheek*, 374 Mass. 613, 618 (1978). The prosecutor's statement was, in essence, an argument — admittedly an "extravagant" one — concerning the credibility of the defendant. The prosecutor's statement did not "interject the prosecutor's personal belief of guilt into the jury deliberation." *Commonwealth* v. *Thomas*, 401 Mass. 109, 115 (1987). We conclude that the prosecutor's summation did not create a substantial likelihood of a miscarriage of justice. See *Ciampa, supra*.

4. *Relief pursuant to G. L. c. 278, § 33E.* The defendant asks that we use our power pursuant to G. L. c. 278, § 33E, to order a new trial or enter a verdict of a lesser degree of guilt. The fact that the evidence against the defendant is circumstantial is not a reason for such relief. See *Common-*

*wealth* v. *Corriveau*, 396 Mass. 319, 339 (1985); *Common-wealth* v. *Best*, 381 Mass. 472, 483 (1980); *Commonwealth* v. *Smith*, 350 Mass. 600, 604-607 (1966); *Commonwealth* v. *Bonomi*, 335 Mass. 327, 355-356 (1957).

Reviewing the entire record, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, in the defendant's favor and order a new trial or enter a verdict of a lesser degree of guilt.

*Judgment affirmed.*