Willie ATKINS, Jr. *v.* STATE of Arkansas

CR 92-212                                   836 S.W.2d 367

Supreme Court of Arkansas
Opinion delivered July 20, 1992

*Ralph C. Goza*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Didi Sallings*, Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Willie Atkins, Jr., was convicted of the first degree battery and rape of his girlfriend's two-year old daughter. He was sentenced to 20 years imprisonment and life imprisonment, respectively. Atkins' sole point of error on appeal is that there was insufficient evidence to support the jury's verdict. We find no merit to his appeal and affirm.

Atkins, a 34-year old man who was separated from his wife, met Marie Powell in 1989 and subsequently moved in with Ms. Powell and her three young children in January 1990.

At approximately 7:45 a.m. on October 31, 1990, Atkins and Marie Powell arrived with Ms. Powell's youngest child, "C", aged two years and eleven months, at the emergency room of the Ouachita County Hospital. The child was not breathing and had no pulse. The emergency room staff was eventually able to resuscitate her after some 45 minutes. An examination revealed extensive bruising to C's head and face, dislocation of her left hip, and bleeding from her vagina. The E.R. nurse noted the blood was bright red, indicating fresh blood. X-rays revealed a tenth rib fracture that was four to six weeks old.

Later that morning, the child was flown by helicopter to Arkansas Children's Hospital. C arrived in a comatose condition, totally unresponsive to external stimuli. Extensive bruising was again noted on her forehead and around her ears. A genital exam revealed external bruising and two lacerations to the hymen. Old scarring was also noted on her chest, back, and legs.

The bruises on C's head and vaginal area were red in color, indicating they had been inflicted within 24 to 36 hours of her arrival at the county hospital. Blood was present at the areas of lacerations to the hymen. The vaginal opening was noted to be almost twice the size of that of a normal child of C's age. X-rays revealed five rib fractures — two of which were estimated to be

two weeks to two months old and three of which were almost healed and estimated to be over two months, but less than a year, old. According to the radiologist, these fractures were caused by squeezing or shaking, commonly known as "rag doll" injuries. There was also an ankle fracture, again under a year old. Blood tests indicated extremely elevated levels of liver enzymes in the blood stream. The emergency room physician opined at trial that the condition was probably caused by a strong blow or repeated blows to the abdomen. He also testified that the child's breathing most likely stopped due to a significant blow to the head, by strangulation, or by smothering. At the time of trial, C was still in a vegetative state and it was predicted she would most likely remain so.

Physicians from both hospitals confirmed that C had been both physically and sexually abused within 24 to 36 hours of her arrival at the Ouachita County Hospital. The medical evidence of abuse in this case is not in dispute, only the identity of the perpetrator.

Melissa Barkheimer, an emergency room nurse at the county hospital, testified that Atkins told her he was standing in the bathroom that morning to urinate when C came and stood behind him and made a funny noise. He told her to stop acting silly, noticed gurgling in her throat, and ran to get help.

Officer Michael Benson talked to Atkins at the hospital and later took a statement from him on November 5, after Atkins was arrested. In his statement, Atkins said that early on the morning of October 31, Marie dressed the two older children for school and, as she was leaving the house, told C to go to the bathroom. Atkins stated he heard C make a sound from the bathroom, to which he responded "Daddy doesn't feel like playing this morning." She then began gagging. He stated he ran down the stairs with her, falling in the process. Atkins said the child did not hit her head in the fall. He was able to find a ride to the hospital with a neighbor and met Marie returning from the bus stop, who joined them. Atkins denied ever abusing or mistreating C except to spank her on the legs with a switch for discipline. Atkins stated that on October 30, he, Marie, and all three children were at his parents' house where Atkins was working on a car. He stated they returned home at nine or ten p.m.

Officer Benson testified that Atkins' story about falling down the stairs with the child was not mentioned when Atkins first spoke with him at the hospital, some six days earlier.

Following the medical and police testimony, several State witnesses testified about the family dynamics and events leading up to the morning of October 31.

Johnnie Mae Cooper, a friend of Marie Powell's, lived with Marie off and on for two and a half years. She moved to a nearby apartment in the same complex a few weeks after Atkins moved in with Marie. Ms. Cooper testified C appeared happy and playful until Atkins moved in with Marie. Thereafter, the child became withdrawn. Ms. Cooper first observed bruises on C in the summer of 1990 while babysitting. On different occasions, she observed the child with black eyes, a knot on her forehead, a busted lip, bruising around the ribs, and a bite mark. Ms. Cooper testified her relationship with Marie became estranged when she began asking Marie about the injuries to C. She denied the estrangement had anything to do with Atkins.

Jonathan Fogle, a ten-year old neighbor, testified he once witnessed Atkins knock C out of her chair and start whipping her when she complained about eating her oatmeal. Zylpha Fogle, Jonathan's mother, said she began noticing bruises and bites on C in the summer of 1990. She stated she babysat the child about once a week but Marie and Atkins prevented her from keeping C when she inquired about the injuries. Ms. Fogle testified Jonathan ran to her and told her about Atkins knocking C out of her chair and she had no reason to disbelieve him.

Marie Powell testified Atkins began living with her in January 1990. Her version of events on October 30 differed from Atkins'. Ms. Powell stated her sister kept the children all that day and brought them back to her house between 5:30 and 6:00 p.m. She stated Atkins was gone all day and she did not know where. He came home that evening at approximately 9:00 p.m., after the children were already in bed. Ms. Powell observed no bruises on C, or vaginal bleeding, either that day or evening.

Ms. Powell testified that on the morning of October 31, she arose at 7:00 a.m. and prepared the older children for school. She stated she glanced at C in her bed and observed nothing unusual.

Atkins was still in bed. As she left to take the children to the bus stop, she told C to go to the bathroom and instructed Atkins to watch her. She observed C slowly getting out of her bed. The next time she saw C, Atkins had her in the car and was "hollering" that something was wrong. She stated Atkins told her C fell down and that he grabbed her and ran downstairs, falling as he went. Ms. Powell stated she had been gone from the house five or ten minutes that morning and that Atkins was alone with the child.

Ms. Powell testified to a number of visits to the doctor concerning the swelling to C's face, her black eyes, and the knot to her forehead. She stated the doctor told her the symptoms were allergy-related, for which she was given medicine and told to keep C out of the sun. Ms. Powell did state Atkins and C had a good relationship and denied that she or Atkins ever abused her; however, she conceded there was no one else besides Atkins who could have inflicted the injuries within the twenty-four hour period before C's admission to the hospital.

The evidence also showed that Ms. Powell took C to Dr. A.N. Olaimey for checkups and various complaints until September 1988. No abuse was documented during that time. Ms. Powell did not return to Dr. Olaimey until two years later, in September 1990, at which time she complained of a knot on C's forehead. Dr. Olaimey told Ms. Powell to monitor it and return if problems increased. X-rays and a neurological examination were normal. Ms. Powell returned on October 15, stating C's face was getting dark and swelling and that she was vomiting and was fatigued. Dr. Olaimey testified he was unaware Ms. Powell had taken C to a different doctor in May 1990, and again in August 1990, with the same complaints of blackness around the eyes and vomiting.

In his defense, Atkins offered the testimony of two employees with the Arkansas Department of Children and Family Services. Gary Chance testified that in May 1990, he received an anonymous phone call that C had been physically abused by her mother's boyfriend. After an interview with Ms. Powell and Atkins, and after reviewing the hospital report, Mr. Chance accepted the explanation that the bruising underneath the child's eyes and facial swelling were sinus-related.

Betty Grissom received a report that Ms. Powell was neglecting her children in September 1990. After a visit to the

home, during which she visited with Ms. Powell and C, she observed no signs of neglect. Ms. Grissom stated she did not look for signs of abuse as she was there on a neglect call.

Atkins also testified in his own defense. He stated he was not convinced C had been abused and denied he was responsible. Atkins stated on October 30, he was at his parents' house all day working on his brother's car. He stated Marie and the children came to the house and they all went home together, arriving at 10:00 p.m., and went straight to bed. He did not notice any bruises on C and did not know what Marie had been doing that day. His story of the events on the morning of October 31 matched that in his statement to Officer Benson on November 5. Atkins stated it was unusual for Marie to ask him to watch C as she had always used the bathroom by herself. He stated Marie had been gone no longer than five minutes from the time he heard C fall to the floor and the time he ran out of the house with her. Atkins testified he did not notice any bruises that morning because he was more concerned with her seizures. He testified he and Marie must have passed C back and forth between them in the car 20 times on the way to the hospital.

Atkins' motions for directed verdict, properly made at the close of the State's case and at the close of all the evidence, are challenges to the sufficiency of the evidence. In reviewing the denial of a motion for directed verdict, the evidence is viewed in the light most favorable to the appellee, considering only the evidence that tends to support the verdict. *Brown* v. *State*, 309 Ark. 503, 832 S.W.2d 477 (1992). Substantial evidence is evidence which is of sufficient force and character to compel a conclusion one way or another with reasonable certainty and which induces the mind to go beyond mere suspicion or conjecture. *Townsend* v. *State*, 308 Ark. 266, 824 S.W.2d 821 (1992). Circumstantial evidence may be sufficient to sustain a conviction provided, where circumstantial evidence alone is relied upon, it indicates the accused's guilt and excludes every other reasonable hypothesis. *Black* v. *State*, 306 Ark. 394, 814 S.W.2d 905 (1991).

Atkins concedes the injuries to C are sufficient to support a conviction for rape and first degree battery but argues that he was not the perpetrator and that another possible explanation is that Marie Powell inflicted the injuries and then, realizing what she

had done, hurriedly left the apartment that morning.

■ In support of this theory, Atkins first argues the testimony of Johnnie Mae Cooper was suspect since Atkins was responsible for breaking up a close relationship between the witness and Ms. Powell. Ms. Cooper clearly denied such a motivation for testifying against Atkins. Atkins also attacks the credibility of Jonathan Fogle, arguing his story was "rehearsed" and the testimony was simply not believable. On the contrary, Jonathan's testimony was clear and plausible. Furthermore, he stood by his testimony, even after repeated efforts by defense counsel to shake him on cross-examination. The credibility of witnesses lies within the province of the jury. *Prater* v. *State*, 307 Ark. 180, 820 S.W.2d 429 (1991). It is significant that both Ms. Fogle and Ms. Cooper began noticing injuries to C, and changes in her behavior, when Atkins moved into the home, where none had been noted before. Neither of these women indicated having any major arguments with Marie Powell or with Atkins, although both indicated their friendship and babysitting ceased when they raised questions concerning C's injuries.

Atkins also contends that it is "significant" that all of C's fractures, except for the two most recent ones, were probably sustained prior to January 1990, when he moved in with the Powells. This argument is simply not supported by the evidence. Dr. Leithiser, at Arkansas Children's Hospital, testified the three older rib fractures and the ankle fracture were somewhat less than a year old since, although they did not appear on the x-rays, they appeared on the bone scan. Atkins had been living in the home ten months. The medical evidence, combined with the testimony of the Marie Powell's neighbors, points to a period of abuse that began near the time Atkins moved into the home.

■ As to what occurred the morning C was taken to the hospital, under Atkins' theory, Marie Powell would have to have inflicted some sort of severe trauma or attempted to suffocate or strangle the child in order to have caused her heart to stop beating. Also, the presence of red blood in C's vaginal area suggested sexual abuse occurred shortly before she was brought into the hospital. It is unlikely all this would have taken place while the other two children were still in the home. On the other hand, it is undisputed Atkins was left alone with C that morning,

as Marie Powell had taken the other children to the bus stop. Atkins gave conflicting stories as to what occurred that morning, one version being that he heard C fall as he lay in bed and the other that she came behind him as he was standing in the bathroom. It is also telling that Atkins neglected to mention that he fell all the way down the hardwood stairs with the child until he gave a formal statement to the police, six days after his interview at the hospital. Again, the credibility of witnesses and the weight to be given the evidence are for the trier of fact, who may reject or accept any part of the evidence; such determinations will not be disturbed on appeal when there is substantial evidence to support the factfinder's conclusion. *Brown* v. *State, supra.*

■  The jury was properly instructed that facts in dispute may be proven by circumstantial evidence, and that a fact is established by such evidence when its existence can reasonably be inferred from other facts proved in the case. From the testimony presented, the jury could reasonably have inferred that C began suffering an ongoing period of abuse when Atkins moved into the home, culminating in Atkins' physical and sexual abuse of C shortly before her admission to the county hospital on October 31. Such circumstantial evidence sufficiently supports the jury's verdict of first degree battery and rape.

The record has been reviewed for any prejudicial error under Ark. Sup. Ct. R. 11(f) and none found; we therefore affirm.