Herbert Fred BRENK *v.* STATE of Arkansas

CR 91-182 847 S.W.2d 1

Supreme Court of Arkansas
Opinion delivered January 25, 1993

*Larry Dean Kissee* and *Tom Garner*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. On August 23, 1990, a cooler was found floating in Lake Norfork, Baxter County, Arkansas. It contained cement and the torso of a white female severed at the upper thighs and lower back. The Arkansas State Police and the Baxter County Police conducted an investigation which led them to believe the torso as that of Lou Alice Brenk. Appellant, Herbert Fred Brenk, who was Lou Alice Brenk's husband was a suspect. On September 10, 1990, Albert Roork, Chief of Police for the City of Salem, who was aware of the investigation and that appellant was a suspect had a warrant issued for appellant's arrest for an unpaid DWI fine from 1988. Before arresting appellant on the warrant, Chief Roork contacted, David Lafferty of the Baxter County Police who was involved with the investigation of the discovery of the cooler, to make sure that his arrest of appellant would not interfere with their investigation. Officer Lafferty relayed this message to Bill Beach, who was also investigating the discovery of the torso. Investigator Beach told Officer Lafferty to tell Chief Roork to arrest appellant if he had a valid arrest, but not to do so on behalf of the Baxter County Police. Officer Lafferty relayed this message to Chief Roork. Chief Roork arrested appellant at the home of Lonnie Hodges. At the time of his arrest, appellant had a blood alcohol content of .08. Appellant was on probation in Fulton County for theft/shoplifting at the time of his arrest. A condition of appellant's probation was that he not use or have in his possession any intoxicating beverages. Since appellant's blood alcohol content violated a condition of his probation, Chief Roork notified appellant's probation officer, Billy Benton, and Mr. Benton filed a petition to revoke appellant's probation. Mr. Benton advised appellant that he would need an attorney for the revocation hearing. Appellant requested that his attorney, Tom Garner, be present for the

hearing. Mr. Benton informed the sheriff's department that Mr. Brenk wanted an attorney. On September 12, 1990, the Sheriff of Fulton County, Paul Martin, informed Tom Garner that appellant wanted to talk to him.

On September 11, 1990, the torso was identified as that of Lou Alice Brenk and suspicion settled on appellant, her husband, as the prime suspect. On September 12, 1990, the Baxter County Police, Bill Beach, Lieutenant Frame, and Sergeant Alman, interviewed appellant at the Fulton County Jail, where he was still being held for failure to pay his DWI fine and pending a hearing on the petition to revoke probation. At that time, appellant consented to talk to the Baxter County officers about the disappearance of his wife, Lou Alice. Appellant answered several questions, but indicated he would like an attorney when the officers questioned him about his ownership of the cooler in which Lou Alice's remains were found, at which point the interview ceased.

Appellant was charged with capital murder in connection with the death of Lou Alice Brenk on September 13, 1990, and a warrant was issued for his arrest that same day. Appellant's counsel also entered their appearance on September 13, 1990, and formally requested that he not be interviewed without their permission. A jury trial was held June 17 through July 1, 1991, at which appellant was found guilty of capital murder and sentenced to death by lethal injection by a jury in connection with the death of his wife Lou Alice Brenk. Appellant appeals his conviction on eleven (11) grounds. Our jurisdiction is proper under Ark. Sup. Ct. R. 29(1)(b).

### THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR DIRECTED VERDICT

We treat a challenge to the denial of a motion for directed verdict as a challenge to the sufficiency of the evidence and address it first since the double jeopardy clause precludes a second trial when a conviction in a prior trial is reversed solely for lack of evidence. *Lukach v. State*, 310 Ark. 119, 835 S.W.2d 852 (1992). We must decide this issue on appeal even though the case is being reversed and remanded on other grounds. *Moore v. State*, 297 Ark. 296, 761 S.W.2d 894 (1988). "In considering the issue,

we disregard other possible trial errors." *Id.* at 301, 761 S.W.2d at 897.

■■ The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, whether direct or circumstantial. *Id.* Substantial evidence is evidence forceful enough to compel a conclusion one way or the other beyond suspicion and conjecture. *Lukach*, 310 Ark. 119, 835 S.W.2d 852. In determining the sufficiency of the evidence, we need only ascertain that evidence most favorable to appellee and it is permissible to consider only that testimony which supports the verdict of guilty. *Id.; Moore*, 297 Ark. 296, 761 S.W.2d 894.

■■ At trial, evidence was introduced that appellant owned the cooler in which the remains of his wife were found. Appellant had access to the saw which was determined to have been used to cut up Mrs. Brenk's body. Two people who had been in jail with appellant testified at trial. One of these people, Ted Ullman, testified that appellant admitted to killing his wife and the other, William Lemmons, testified that appellant said that if he had it to do over again he'd make sure he put the portion of his wife's body that was found with the other portions so he wouldn't get caught. Several witnesses testified that they asked appellant about Lou Alice's whereabouts at the time the coroner testified she was already dead and he told them differing stories about where she was. Appellant told some people that Lou Alice had gone to visit her daughter and others that she had left him for another man, but her daughter never saw Lou Alice and reported Lou Alice missing after it became clear that no one in the family knew where Lou Alice was. In his interview with the police of September 12, 1990, appellant said his wife left him on August 24 and he saw her again on August 31 when she returned, gave him some money and took all her clothes. Appellant also told the police that on September 9, he received a note from Lou Alice at their trailer telling him they were through and she wanted a divorce. Appellant also told the police that Lou Alice had taken the rest of her things at that time. Lying about Lou Alice's whereabouts at a time when she was clearly dead indicates a consciousness of guilt on the part of appellant and attempts to cover up a crime are admissible. *See Kellensworth v. State*, 276 Ark. 127, 633 S.W.2d 21 (1982); *Flowers v. State*, 30 Ark. App.

204, 785 S.W.2d 242 (1990). This constitutes substantial evidence from which the jury could have concluded appellant murdered his wife, Lou Alice Brenk.

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS SEPTEMBER 12, 1990, STATEMENT

Appellant claims the statement he made to the Baxter County Police on September 12, 1990, is inadmissible for two reasons. First, appellant claims his arrest by Chief Roork on failure to pay a DWI fine was pretextual and the statement obtained from him by the Baxter County Police, on September 12, 1990, while he was in the Fulton County Jail on that charge was the "fruit of the poisonous tree" and was inadmissible. Second, appellant had been advised by his probation officer, Billy Benton, that he would need counsel for his revocation hearing and had requested counsel for that purpose. Appellant argues that this request invoked both his Fifth and Sixth Amendment rights to counsel, prohibiting the use of any in custodial statement made by him after that request without the presence of counsel. We disagree with both of appellant's contentions.

Pretext is a matter of the arresting officer's intent, which must be determined by the circumstances of the arrest. *Richardson* v. *State*, 288 Ark. 407, 706 S.W.2d 363 (1986). Here, Chief Roork testified at a pretrial hearing that he arrested appellant because he knew appellant was being investigated, knew appellant owed almost $500.00 on a DWI, and was aware appellant had been selling things and had turned off his electric service. Therefore, Chief Roork testified that he was afraid appellant would flee the area and the city would be unable to collect its fine. Chief Roork testified that appellant could have gotten out of jail by paying the fine and posting a bond for his revocation hearing. Credibility of the witness is a matter for the trier of fact and such determinations will not be disturbed on appeal when there is substantial evidence to support the factfinder's conclusion. *Atkins* v. *State*, 310 Ark. 295, 836 S.W.2d 367 (1992). Additionally, there is no indication in the record that Chief Roork or the Salem City Police attempted to question appellant about the disappearance of his wife, the cooler, or any other related matter. The Baxter County Police, who were

investigating the cooler, specifically told Chief Roork not to arrest appellant on their behalf, but to arrest him if he had a valid warrant. Also, it was not until one day after appellant's arrest for failure to pay his DWI fine that the torso was identified as that of Lou Alice Brenk and not until two days after his arrest for the DWI charge that appellant was questioned by the Baxter County Police. On these facts, we do not find the arrest was clearly pretextual.

██ Appellant also contends his request to his probation officer for counsel to represent him at his revocation hearing invoked his Fifth Amendment right to counsel such that any statement he made without the presence of counsel should not be used at trial. In the recent case *McNeil* v. *Wisconsin*, ___ U.S. ___, 111 S. Ct. 2204 (1991), the Supreme Court held an accused's invocation of his Sixth Amendment right to counsel during a judicial proceeding does not constitute an invocation of the right to counsel derived by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), from the Fifth Amendment's guarantee against compelled self-incrimination. As in the *McNeil* case, appellant invoked his Sixth Amendment right to counsel for a judicial proceeding unrelated to the present charge, but did not make any indication that he only wished to deal with the police through counsel and, therefore, did not invoke his Fifth Amendment right to counsel. The Sixth Amendment right to counsel is case specific. Appellant's request for counsel to represent him at the revocation hearing applied only to the revocation matter and not to any other potential charges. Since appellant did not invoke his Fifth Amendment right to counsel by indicating that he wished to deal with the police only through counsel, the *Edwards* rule which appellant cites does not apply. *Edwards* v. *Arizona*, 451 U.S. 477 (1981). We find appellant's September 12, 1990, statement was properly admitted under *McNeil*. *McNeil*, ___ U.S. ___, 111 S. Ct. 2204. The interview properly ceased at the point appellant indicated he did not wish to communicate with the police without the assistance of counsel.

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTIONS TO SUPPRESS EVIDENCE WHICH WAS SEIZED PURSUANT TO VARIOUS SEARCH WARRANTS

Appellant objects to the introduction of evidence seized pursuant to three search warrants, which he claims are invalid. Appellant claims there were insufficient facts presented to any of the magistrates to establish reasonable cause for the issuance of any of the warrants, the warrant issued by Judge Judith Bearden was defective because she did not have authority to issue warrants in Baxter County, and the search by the police of appellant's trailer, van, the 1974 Buick and adjacent block building on October 9, 1990, was an unauthorized nighttime search. Lastly, appellant contends all the evidence seized from any of the searches was a result of his pretextual and illegal arrest and should be suppressed as "fruit of the poisonous tree."

We have already determined that appellant's arrest on the DWI fine was not pretextual. Therefore, we need only address appellant's other arguments.

Appellant claims there were insufficient facts presented to any of the magistrates to establish reasonable cause for the issuance of any of the warrants. We find there was probable cause established to search appellant's home, trailer, and vehicles. The affidavit attached to each search warrant was identical. They each established the remains were about three weeks old, had been identified as Lou Alice Brenk, appellant had told several people he wished to kill his wife during the past two years, and appellant had been telling different stories about Lou Alice's whereabouts for approximately the time period from which the body part was found to the present. Appellant had also said that he "wanted to throw his wife over the bridge" and that she was so heavy and big he needed help to "get her down to a size so he could handle."

> The task of the issuing [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the

[judge] had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Illinois* v. *Gates*, 462 U.S. 213, 238-39 (1983). Clearly, a crime was committed and it is logical that if appellant killed his wife, cut her up, put her torso in a cooler filled with cement and tossed it into the lake, evidence of this crime would probably be found where he was living, on property he owned, and in the vehicles he drove. This certainly is a substantial basis for concluding there was probable cause to issue a search warrant for appellant's home, property, and vehicles.

 Appellant also contends the warrants are invalid because they fail to indicate a specific time the criminal activity took place. The affidavit does indicate that the torso was found August 23, 1990, and had been exposed to postmortem decomposition for a period of time not exceeding three (3) weeks. We think this is a sufficient indication of the time when the crime was committed.

Appellant's only challenge to the search warrant issued by Judge Jim Short on September 11, 1990, was that the affidavit failed to establish probable cause, failed to establish the time during which the criminal activity occurred, and failed to establish that evidence of the crime would be found in appellant's white frame house in Salem, Arkansas. As we have discussed above, the affidavit attached to the warrant was sufficient to establish probable cause, establish the time during which the criminal activity occurred, and establish that evidence of the crime would likely be found in appellant's house.

 Appellant contends the warrant issued by Judge Bearden on September 11, 1990, was invalid because Judge Bearden was a Municipal Judge of Marion County without a written exchange agreement pursuant to Ark. Code Ann. § 16-17-206 (Supp. 1991) valid in Baxter County and, therefore, had no jurisdiction to issue a search warrant in Baxter County. Appellant's construction would have us limit the ability of a judge to issue a warrant to affect only property in the county in which the judge has jurisdiction. Section 16-17-206 is not applicable. The statute which controls a judicial officer's ability to issue a search warrant is Ark. Code Ann. § 16-82-201 (1987). It provides in pertinent part: "A search warrant may be issued by any

judicial officer of this state only upon affidavit sworn to before a judicial officer which establishes the grounds for its issuance." Ark. Code Ann. § 16-82-201(a). The applicable statute does not give any indication that the jurisdiction of a judicial officer in issuing search warrants is limited to the county in which the judicial officer was elected or appointed. In fact, it expressly provides that a search warrant may be issued by *any* judicial officer. We refuse to find that judicial officers are limited to issuing search warrants only in the counties in which they were elected or appointed and, therefore, find that the search warrant issued by Judge Bearden was valid.

Appellant next contends that the evidence seized as a result of the search warrant issued by Judge Crain on October 8, 1990, should be excluded because the warrant did not authorize a nighttime search and a nighttime search was conducted. Appellant is correct that the search warrant executed by Judge Crain did not authorize a nighttime search. However, we have said that as long as a search is begun before 8:00 p.m. and is concluded as soon thereafter as feasible, the search does not violate the ban against nighttime searches. *Brothers* v. *State*, 261 Ark. 64, 546 S.W.2d 715 (1977). This search was initially begun on October 8, 1990, at 5:15 p.m. and terminated at 8:00 p.m. The warrant was extended by Judge Crain to October 9, 1990, and a search was begun at 3:15 p.m. until 5:15 p.m., a break was taken and the search recommenced at 8:00 p.m. and lasted until 9:50 p.m. This does not violate our prohibition against nighttime searches. The original search on October 9, 1990, was begun at 3:15 p.m. and the additional search was commenced at 8:00 p.m. This was a continuation of the earlier search, it was not a new search. Since the initial search on October 9, 1990, was begun before 8:00 p.m. and ended as soon thereafter as feasible, 9:50 p.m., the ban against nighttime searches was not violated.

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION IN LIMINE TO EXCLUDE TESTIMONY CONCERNING VARIOUS LUMINOL TEST RESULTS

Appellant claims it was error for the trial court to admit the results of luminol testing under the relevancy approach of the Uniform Rules of Evidence we adopted in *Prater* v. *State*, 307

Ark. 180, 820 S.W.2d 429 (1991). This relevancy approach was expressly adopted by this court after the conclusion of appellant's trial. The trial court denied appellant's pretrial motion to exclude the results of the luminol testing done by the state's expert witness, Donald Smith, finding it admissible under the *Frye* standard as a scientifically recognized test for a number of years. *See Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). While the evidence may well be admissible under the *Frye* standard, "[t]his court has never adopted the *Frye* standard even though we signaled it as 'see' in a per curiam opinion. *See Dumond*, v. *State*, 294 Ark. 379, 743 S.W.2d 779 (1988)." *Prater*, 307 Ark. 180, 185, 820 S.W.2d 429, 431. Instead, we recently adopted the more liberal standard based upon the relevancy approach of the Uniform Rules of Evidence. *Id.*

Under *Prater*, the trial court is required to

> conduct a preliminary inquiry which must focus on (1) the reliability of the novel process used to generate the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse or mislead the jury, and (3) the connection between the novel process evidence to be offered and the disputed factual issues in the particular case. [Citation omitted.]

> Under this relevancy approach, reliability is the critical element. . . . The relevancy approach, unlike the *Frye* standard, permits, but does not require, a referendum by the relevant scientific community to determine the reliability of the technique. Many times that factor alone will determine the issue. On the other hand, courts may look to a number of other factors which bear upon reliability. These include the novelty of the new technique, its relationship to more established modes of scientific analysis, the existence of specialized literature dealing with the technique, the qualifications and professional stature of expert witnesses, and the non-judicial uses to which the scientific techniques are put. [Citation omitted.]

> The frequency of erroneous results produced by a novel scientific technique is an important component of reliability. . . .

. . . [as is] proof of the use of the correct protocol during the specific test.

. . . .

After assessing the reliability of the evidence, the trial court must also weigh any danger that the evidence might confuse or mislead the jury. . . .

This Rule 702 determination of whether the evidence might confuse or mislead the jury is separate from a Rule 403 weighing. Under the relevancy approach, the proponent of the evidence must first prove that it is reliable and will not confuse or mislead the jury. If the court rules that it is admissible under Rule 702, the opponent of the evidence might then object to it on the basis that its probative value is outweighed by unfair prejudice, or it is a waste of time, or it is needless presentation of cumulative evidence. A.R.E. Rule 403.

The third general consideration under the Rule 702 relevancy analysis is whether the proposed expert testimony is sufficiently tied to the facts of the case to aid the trier of fact in resolving the dispute. The proponent of the evidence must show the trial court precisely how the expert's testimony is relevant and helpful to the case. Failure to make this proof is a sufficient ground to exclude the evidence.

*Prater*, 307 Ark. at 186-190, 820 S.W.2d at 431-34.

We have not previously decided whether the results of luminol testing can be admitted at trial. The issue was raised in *Larimore* v. *State*, 309 Ark. 414, 833 S.W.2d 362 (1992), but we did not address it because we could not determine from the briefs which part of the luminol testing had been admitted at trial or why this was alleged to be error. The issue has been sufficiently presented to us in the instant case for our consideration.

Luminol testing was done of appellant's trailer, his car, his van, and the block building behind his trailer. The luminol testing was conducted by Donald Smith, criminalist for the Arkansas State Crime Lab. Appellant filed a motion in limine to prohibit introduction of the results of the luminol testing. This motion was

denied and appellant renewed his objection to this evidence at the time it was admitted. Several photographs showing the results of the tests on these areas were admitted at trial and Mr. Smith testified in detail about the results of the luminol tests he conducted, indicating on drawings of the building, trailer and car where he obtained positive reactions.

We find the admission of this evidence was error. As the state's witness, Donald Smith, and appellant's witness at the hearing on the motion in limine, Robert Briner, both testified, and as appellee concedes in its brief, luminol is only a preliminary test which indicates the *possible* presence of blood. Evidence presented at the hearing on the motion in limine established that luminol testing is unable to indicate the definite presence of blood, much less determine whether any possible blood present is human or animal. Luminol testing is done by spraying a luminol reagent on the item or in the area to be tested. Luminol reacts with certain metals and vegetable matter as well as blood, animal and human to give off a light blue luminesce similar to a luminescent watch dial. It is impossible to tell without follow up testing which of the possible reactants is causing the reaction. Further testing is necessary to determine whether what caused the reaction is actually blood and whether, if blood, it is animal or human blood. Luminol testing, without any additional testing, is unreliable to indicate the presence of human blood. Additionally, luminol is not time specific. That is, a reaction will occur even many years after a reacting substance has been in place, so it is impossible to tell how long the substance that is causing the reaction has been in place.

In this case, very little additional testing was done to determine whether the substances causing the luminol reaction were human blood since a minute amount of blood was actually found. The only samples which could be found and which tested positive for human blood consisted of a small speck of blood found on the back of a kitchen drawer, and an area of blood about one millimeter square found on the inside of one of appellant's pairs of jeans. The blood samples were so small that the testing could only establish that the sample tested was human blood and could not establish the blood type of the samples or connect the samples in any way with the victim, Lou Alice Brenk, or appellant. A bedsheet found in the bedroom of appellant's trailer tested

positive for the presence of blood, but the results of the test used to establish whether blood is human were negative. Given the lack of follow-up testing, the results of the luminol test, which are presumptive only, had no probative value and did nothing to establish the likelihood of the presence of Lou Alice Brenk's blood, or even human blood, in the trailer, the block building, appellant's car, or on any of the other items tested where follow-up testing was not able to confirm the presence of human blood, much less blood of the same blood type as Lou Alice Brenk. *State v. Moody*, 573 A.2d 716 (Conn. 1990). Since we have determined that luminol tests done without follow-up procedures are unreliable to prove the presence of human blood or that the substance causing the reaction was related to the alleged crime, we find it was error for the trial court to admit the evidence of luminol testing done by Mr. Smith where there was no follow-up testing done to establish that the substance causing the luminol reaction was, in fact, human blood related to the alleged crime. *See Moody*, 573 A.2d 716 (Conn. 1990); *see also Lee v. State*, 545 N.E.2d 1085 (Ind. 1989); *cf. Commonwealth v. Yesilciman*, 550 N.E.2d 378 (Mass. 1990).

Additionally Don Smith was allowed to testify that in his opinion the results of the luminol testing were caused by blood, the luminol pictures and testimony by Mr. Smith gave the impression of a bloodbath and cleanup occurring in the trailer and block building behind the trailer that was highly prejudicial. Mr. Smith testified that although he was not aware of any literature dealing with establishing the substance causing the luminol to react based on the type of reaction, he felt he was able to do so. There is no indication in the record that personal observation of the results of the luminol testing is a reliable or accepted way to establish that the reaction was caused by blood and not one of the other substances which react with luminol. We think it was error to allow the photos into evidence and to allow Mr. Smith to testify about the other areas where reactions occurred, but photos were not introduced, and to allow Mr. Smith to testify that he thought that the reactions indicated the presence of blood without adequate follow-up testing having been done to establish that what caused the reactions was, in fact, blood. This was likely to be misleading and confusing to the jury such that even the cross-examination establishing that what caused the

reaction in the photos and the areas where no photos were introduced was only possibly blood cannot cure the prejudice that certainly resulted.

## THE TRIAL COURT ERRED BY ALLOWING THE PROSECUTOR TO MAKE IMPROPER REMARKS IN HIS CLOSING STATEMENT REGARDING THE DEFENDANT'S BURDEN OF PROOF

The trial court has a wide latitude of discretion in controlling the argument of counsel. *Powell* v. *State*, 270 Ark. 236, 605 S.W.2d 2 (1980). Appellant argued in closing that the identification method used by the state to determine the torso found in the cooler was that of Lou Alice Brenk was unreliable. It was not an abuse of discretion for the trial court to allow the prosecutor to argue, in reply, that appellant had the opportunity, not the obligation, to get an expert to dispute the findings of the state's expert.

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO EXCLUDE TESTIMONY OF JACKIE BRENK

Appellant made a pre-trial motion to exclude the testimony of his ex-wife, Jackie Brenk, who had divorced him in 1985. The trial court allowed her to testify. At trial, Jackie Brenk testified that appellant had threatened her when they were married, had tried to kill her, and had told her he would kill her, cut her body to pieces, and scatter the pieces from Mammoth Springs, Arkansas, to Louisiana so that no one would ever find her. Jackie Brenk testified appellant threatened her several times in the late 1970's and early 1980's. Appellant argues this testimony should have been excluded because it was evidence of prior bad acts of the defendant and did not fall under Ark. R. Evid. 404(b). While appellant's threats against his ex-wife are undoubtedly "prior bad acts," they are admissible to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Given the similarity of the circumstances of Lou Alice Brenk's death and the specific threats made by appellant to Jackie Brenk, although several years earlier, these threats were admissible to show appellant's "intent, plan, and identity." *See Snell* v. *State*, 290 Ark. 503, 721 S.W.2d 628 (1986), *cert denied*, 484 U.S. 872 (1987); *Lee* v. *State*, 545

N.E.2d 1085 (Ind. 1989).

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S OBJECTION TO THE TESTIMONY OF KATHLEEN EATON

██ Appellant next contends that testimony by Kathleen Eaton that she saw Lou Alice Brenk come into the post office "beat up" should also have been excluded as a prior act of misconduct. Kathleen Eaton did not testify that appellant had beaten Lou Alice. Ms. Eaton simply testified that she knew there was trouble between Lou Alice and Herbert Brenk and that one day Lou Alice came into the post office and she was "beat up." Ms. Eaton's testimony does not imply that appellant caused Lou Alice to be beaten, therefore it is not excludable as a prior bad act under Ark. R. Evid. 404(b) as appellant contends. Also, several other witnesses testified, without objection, that they had observed Lou Alice Brenk with bruises and black eyes. Since essentially the same evidence was admitted without objection, any potential error in allowing Ms. Eaton to testify to essentially the same facts was harmless. *Orr* v. *State*, 288 Ark. 118, 703 S.W.2d 438 (1986).

## THE TRIAL COURT ERRED IN DENYING APPELLANT'S OBJECTION TO HEARSAY EVIDENCE

██ Appellant contends it was error for the trial court to allow Dr. Rose to testify as to what his colleagues said regarding the number of points needed for an identification because it is hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ark. R. Evid. 801(c) (1987). The alleged hearsay appellant objects to occurred when Dr. Rose was asked "[w]hy did you pick 14 as a point of identification?" Dr. Rose's response was:

> Well, colleagues that do the same kind of work in forensic osteology, one in discussing techniques said that he liked —
>
> . . . .
>
> One colleague says that he likes to have eight points

similarity, another colleagues [sic] says 10 points similarity. I myself have never developed a magic, sort of magic, number, if you will. But I always make sure that you see these two previous numbers that I've been told my colleagues use, and these are major anatomical features, all 14 of these are. These are very large portions of the bone. And it was at that point that I was satisfied.

As is clear from the question and Dr. Rose's answer, Dr. Rose was simply explaining why he used 14 identification points and not that his other colleagues actually use eight (8) or ten (10) identification points. *See Richmond* v. *State*, 302 Ark. 498, 791 S.W.2d 691 (1990). Since this testimony was not hearsay, it was not inadmissible hearsay as appellant claims.

### THE TRIAL COURT ERRED IN FAILING TO EXCLUDE TESTIMONY OF TWO SURPRISE WITNESSES

Appellant objects to the introduction of the testimony of two witnesses, William Lemmons and Ted Ullman, both of whom were incarcerated with appellant and who testified about incriminating statements made by appellant while he was in jail awaiting trial. These witnesses came forward during the trial and the trial court granted a five-day continuance for the defense to interview the newly discovered witnesses. Appellant claims the testimony of these witnesses should not have been allowed because appellant had based his entire case around the fact that no confession existed and was not able to prepare for this testimony or restructure his case. Since a new trial has been granted on other grounds, this argument is moot. Appellant will have had plenty of time to restructure his case for a new trial and to change his defense, if necessary, before his new trial begins.

### THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE COMPARISONS OF A LOST X-RAY

Appellant contends that Dr. Rose should not have been allowed to testify regarding the use of an original X-ray of Lou Alice Brenk which he used to make comparisons to the torso in order to make an identification. The original X-ray was lost, but Dr. Rose had made slides of the original which were used at trial.

598

The following exchange occurred at trial:

[PROSECUTION]: For the record, Your Honor, the defense having rested, I would, at this point raise the issue with respect to earlier objections about the issues related to the X-rays and the evidence that was introduced through Dr. Rose. There were certain objections made that were based on the apparent misplacing of the one original X-ray after the identification process by Dr. Rose. Part of Wednesday's delay in the proceedings was to make sure that the defense, which were furnished with Dr. Rose's slides at the conclusion of the testimony on Tuesday, had an opportunity to submit those slides to Dr. Kearns, their identified expert, and have him review those slides and make a determination, based on that, as to whether to have him testify as an expert, and any issues that he would see in that. I would note that defense has now rested, and they've chosen not to call Dr. Kearns. Furthermore, I would note for the record that I have called Dr. Kearns and received, through him, his stated opinion that the examination by Dr. Rose and Ms. Murray appeared to him valid and well based from the evidence, that the slides were clear and gave an adequate basis for a determination of the identification that they made. That he saw no points of disagreement with their findings, and that he said, of course, he would like to have seen the original X-ray, but it was not necessary, in any sense, to reach the conclusion that Dr. Rose and Ms. Murray reached. Furthermore, he said that he thought that the original X-ray would have only provided him a better basis to confirm the identification, and would not have been, in any way, helpful to challenge the identification made by Dr. Rose and Dr. [sic] Murray. I think that's a fair and accurate summary of Dr. Kearns's statement to me, and in the absence of him being called as a defense witness, I would submit that the issues raised initially by the defense with regard to questions about the X-rays, the one missing X-ray and the use of the slides, I think have been effectively withdrawn. If there is still a significant question on the defense's part, I would submit that we jointly subpoena Dr. Kearns and let him address the evidence in testimony.

THE COURT: Says the defense?

[DEFENSE]: Your Honor, part of what [the prosecution] said is true. To my knowledge, Dr. Kearns would not, he didn't say could not, dispute the findings of Dr. Rose and Ms. Murray. We were told that he would like to see the original X-rays and he would make an opinion. He didn't know if it would make any difference if he did see the original X-rays.

THE COURT: If the defense intends, for purposes of an appeal, to pursue the issue about the X-ray not being presented and about you not being able to prepare an adequate defense, then I want Dr. Kearns to come testify in this case. Apparently [the prosecution] understood Dr. Kearns one way, and you're suggesting that you understood Dr. Kearns another way.

[DEFENSE]: I believe what [the prosecution] said is basically what I got, just more elaborate. I don't know. It could have been a longer conversation.

THE COURT: If there's any substantial dispute or objection being made, then I think it would be appropriate to try to get Dr. Kearns here first thing Monday morning. I'm going to leave it up to defense. What's your response? Do you want Dr. Kearns here on Monday?

[DEFENSE]: No, we don't.

■ Appellant waived his right to object to the loss of the original X-ray by not calling Dr. Kearns, or anyone else, to testify that the original was necessary for identification or that Dr. Rose and Ms. Murray's identification could not be disputed without the original.

### THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO HEARSAY TESTIMONY BY LOY CHESHIRE

■ Appellant contends it was error for the trial court to allow Loy Cheshire to testify that Lou Alice Brenk was crying and when he asked her "Lou, what's the matter, Honey?" she had said to him "[h]e's going to kill me, Dink." The trial court allowed this as a present sense impression showing Lou Alice's fear. Trial

courts have a wide latitude of discretion in the admission of evidence. We do not reverse absent an abuse of that discretion. We do not find that the trial court abused its discretion in this instance. This statement falls under Ark. R. Evid. 803(3), which states:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition, such as intent, plan, motive, design, mental feeling, pain, and bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

## CONCLUSION

We find the trial court erred in admitting the results of the luminol testing done by Donald Smith in the absence of follow-up testing to confirm the substances causing the reaction were human blood related to the victim or the crime. On all other grounds, we affirm. Therefore, we reverse and remand for proceedings consistent with this opinion.

HAYS and BROWN, JJ., dissent.

ROBERT L. BROWN, Justice, dissenting. I would affirm the conviction and judgment.

I am not willing at this juncture to exclude luminol testing as irrelevant in every instance where the presence of human blood is not confirmed. That is what the majority opinion does. I believe that the test is probative as a preliminary screen for the presence of blood, which is exactly what it was used for in this case.

No one contends that luminol testing is conclusive for human blood or that it does not show positive for other substances and even some metals. But these points were explored on cross-examination by defense counsel and argued to the jury. Thus, it becomes a matter of what weight to accord the test rather than its admissibility. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 550 N.E.2d 378 (1990).

The Massachusetts Supreme Judicial Court addressed this point in *Yesilciman.* In that case, it could not be determined whether occult blood found in the defendant's car and on his

clothing was human or animal; nor could the age of the blood be ascertained. The court observed that evidence is not rendered prejudicial merely because it is inconclusive. The court further pointed out that the defendant's counsel had extensively argued the speculativeness of the testing. It then concluded that the weight to be given the test was a matter for the jury.

So should it be in this case. I would affirm the admission of this evidence and let the jury assess its value.

HAYS, J., joins.